### ESTATE OF CHARLES A. JAMES, DECEASED.

[No. 151,588; decided June 12, 1897.]

**Evidence—Weight and Credibility.**—The court is not bound to decide in conformity with the declarations of any number of witnesses against a less number or a presumption of other evidence satisfying the judicial mind.

**Marriage—Sufficient Marriage Contract.**—The following contract signed by the parties, but not witnessed, is not legal in form: "San Francisco, Cal., January 6th, 1895. We, the undersigned, Charles A. James, aged 60, and Laura Milen, aged 19, do hereby mutually bind ourselves unto each other as husband and wife. This agreement or contract to be authority for same before God and man."

**Marriage—Assumption of Marital Rights and Duties.**—In this case where a woman claimed to be the widow of the decedent by virtue of a contract entered into with him followed by an assumption of the marriage relation, the court holds, after an extended review of the evidence, that there was no mutual assumption of rights, duties or obligations marital, and that they never lived together as husband and wife.

**Parent and Child—Evidence of Paternity.**—In this case, where it is contended that a woman is the widow of the decedent by virtue of a contract marriage followed by an assumption of conjugal relations, and that a child was born of the union, the court holds that there was not an assumption of the relation of husband and wife, and that the child is not the offspring of the decedent.

**Forged Marriage Contract—Expert and Other Evidence.**—An alleged contract of marriage produced in this case is, in the light of expert and other evidence, held a forgery.

George D. Shadburne, for the absent heirs.

W. H. H. Hart, George W. Fox and Aylett R. Cotton, for Laura Milen James and Theodore Milen James.

COFFEY, J. On the 29th of January, 1895, there was filed in this court by A. C. Freese, public administrator, a petition alleging that one Charles A. James died in this city and county on the twenty-eighth day of January, 1895, being a resident herein and hereof, and leaving estate consisting of real and personal property of value unknown to the petitioner; that said James died intestate and left, so far as known to petitioner, as heir at law a nonresident niece; and that to collect and preserve the estate a special administrator was needed.

Upon the petition thus presented the special letters were granted and issued to the public administrator, and he thereupon immediately entered upon the premises and took possession of the property, real and personal, no one appearing to oppose or obstruct him in the exercise of the duties of his office or claiming paramount right or authority by virtue of relation to decedent or in any other manner.

Thereafter, and on the 31st of January, 1895, the said public administrator filed a petition for letters of administration, reciting the day and date of death of the said decedent, the place of death and of residence, as stated in the petition for letters of special administration; and that the said decedent left real and personal estate exceeding $10,000 in value, not exactly how much in excess was known to petitioner.

Thereafter, and on the 8th of February, 1895, a petition was filed in this court signed "Mattie E. James by M. C. Hassett and George Hudson, attorneys for petitioner," reciting the facts of death and residence as in the preceding petitions and laying the value of the estate at about forty-five thousand dollars, and alleging that the next of kin and heir at law of the decedent "is Mattie E. James, of legal age, residing in said city and county, a niece of said" decedent; that diligent search and inquiry for a will developed no such document; that deceased died intestate; and that as niece, next of kin, and heir at law said Mattie E. James was entitled to

letters of administration. On February 21, 1895, this petition was withdrawn and letters issued to the public administrator.

On January 29, 1895, as appears by the record, when the special letters were granted to the public administrator there was present in court and sworn and examined but one witness, Mr. R. F. Mogan, who also acted as attorney on that occasion for the applicant.

On February 21, 1895, as appears by the same record, when the petition of Mattie E. James was withdrawn in open court and the petition of the public administrator for general letters was granted, there were present and sworn and examined as witnesses upon the hearing the said Mr. R. F. Mogan, Mrs. Laura Milen James, and Mr. George D. Shadburne. Mr. Shadburne had been appointed attorney to represent absent heirs, minors, and others generally under the statute in such case made and provided, by an order of the court dated January 31, 1895; the heirs or persons for whom he was to appear were in that order described as "at present unknown"; he served his notice of appearance the same day. On February 26, 1895, one Annie B. Moss, formerly Annie B. James, a widow, entered an appearance by Isaac Joseph, attorney, of Sacramento, California.

On April 15, 1895, the official appraisement of the property was filed, by and from which it appeared that the total value of the property was $46,617.86.

The real property, 925 Howard street, valued at $15,000.00
Cash on term deposit in savings union........ 28,750.88
Other cash, in hands of administrator........ 2,128.18
Furniture and other mixed personal property.. 738.80
                                              ———————
                                              $46,617.86
                                              ———————

On April 22, 1896, a petition for distribution was filed by George D. Shadburne, as attorney for P. M. James, Charles T. James, Nathan W. James, Francis T. Broughton, Lucy A. Nichols, William J. Clark, Lydia E. Hoxie, George W. Clark, Hannah A. Wadsworth, Amy A. Reisch, William Henry Barber, Mattie E. James, Daniel M. James, Elizabeth E. Barber, Lydia L. Hopkins and Willard B. James, claiming to be next of kin and heirs collateral of the deceased Charles A. James,

who died intestate, and as such heirs entitled to the whole of said estate in the proportions set forth in the said petition, being brothers and sisters and nephews and nieces.

On May 5, 1896, a petition signed "Laura Milen James, petitioner, W. H. H. Hart, George W. Fox, attorneys for petitioner, Aylett R. Cotton, of counsel for petitioner," was filed, in which petition, after the necessary formal allegations in reference to the condition of the estate and its readiness for settlement and distribution, petitioner averred that she was the wife of the decedent intestate at and before the time of his death, and thereafter and thereby became his widow; that she was over the age of eighteen years; that Milen James, an infant under the age of one year, is the only child of deceased, and that she and the said Milen James are the only heirs at law of said decedent, and that they are entitled to distribution in equal shares. To each of these petitioners' claims, answers and denials were presented in due season and proper form by the respective parties and issue was joined.

The petitioner Laura claims that she intermarried with the decedent, Charles A. James, on the sixth day of January, 1895, by a contract in writing signed by both parties; the body of it is written by her at his dictation, and the whole of it being in words and figures as follows:

"SAN FRANCISCO, Cal., January 6th, 1895.
"We the undersigned, Charles A. James aged 60 and Laura Milen aged 19 do hereby mutually bind ourselves unto each other as husband and wife. This agreement or contract to be authority for same before God and man.
"CHAS. A. JAMES.
"LAURA MILEN."

According to the testimony of the petitioner this contract was consummated on the evening of the day of its date and the conjugal relations were continued and repeated every night until the decedent expired on the 28th of January, 1895.

Assuming for the nonce the formal and verbal efficiency of this exhibit, such a document was at that time valid under the statutes of this state, but happily for the concord of the community, the sanctity of the domestic relation, and the security

of the right of property from covert assault, the statute was modified by abolishing this mischievous clause of the code in the session of the legislature embracing the inception of this alleged agreement: Stats. 1895, p. 121, act approved March 26, 1895.

The document in dispute, however, is not within the purview of this amendment, having antedated the approval of the amendatory act: Civ. Code, secs. 55, 57, 68.

If the allegations of the petitioner Laura be established as facts, and if the contentions of her counsel be correct as law, she is entitled to one-half of this estate and the minor is entitled to the remainder.

It is contended by counsel for claimant Laura that as no particular form is prescribed by section 55 of the Civil Code, and as no written form is necessary when the intent of the parties to become husband and wife is apparent from their subsequent acts, therefore the language of the alleged contract should be construed in the light of the evidence produced on the trial in this case.

Accepting this contention as the true theory, what is the evidence to support the allegations and claim of petitioner Laura?

It is argued by counsel for her that the consent to marriage and the fact of marriage are proved by the testimony of Laura, who had actual knowledge thereof, by Dr. Milen and by Mrs. Milen, who saw the written consent and heard the admission of Dr. James, also by Dr. Terry and son, to whom Dr. James admitted the marriage, and by George Williams and John Bigley and by Mrs. Lulu Dickman, sister of claimant.

The petitioner Laura at the time of the taking of her testimony upon the hearing of this application, December 10, 1896, testified that she was twenty years of age, having been born on the 2d of April, 1876, in Cleveland, Ohio; her father was Theodore Milen, her mother died about 1890; the present Mrs. Milen was her stepmother; about six years ago the family, consisting of her father, her stepmother, her sister and herself came to California and went to reside at 321 Ellis street; Laura went to school at Blake's Seminary in Oakland; she has been a little deaf in her left ear since infancy; she

went for a short space to a convent in this city near to her home on Ellis street; she first met the deceased, Dr. Charles A. James, on December 13, 1894; the meeting took place at 925 Howard street; her stepmother and herself had taken rooms there on the day preceding; met Dr. James in the hall, Mrs. Milen being present; the latter said to Dr. James: "Doctor, this is Miss Milen"; she had catarrh and took treatment therefor from the doctor every day from the 14th until the close of December, 1894; the doctor knew of her deafness and said it was caused from the catarrh; Dr. James had no regular office hours; she practiced on the pianoforte on an average about three or four hours a day, and when she was playing Dr. James would come into the front parlor, which they had the privilege of using on account of the smallness of their own apartment; the first time he came into the parlor while she was playing he complimented her on her execution, saying that she played beautifully, and engaged in conversation with her, inquiring how long she had been in California and making other inquiries evincing interest in her personal history; the front and rear parlors were divided by folding doors; the rear room was used by Dr. James as an office— the doors intervening were sliding with ground glass upper panels; back of the rear parlor was a chamber separated by solid frame doors; she took her treatment for catarrh in the rear parlor; it was always the same treatment—spray; on the 14th of December, 1894, in the evening, a lunch was provided for the ladies by the doctor, consisting of cream cheese, crackers, pickles and sour wine; they sat together until quite late in that room; he had a fire there and he often came·in and said, "You have no fire in your room, come into my office"; she and the deceased had conversations in his office and in the front parlor between the 14th and Christmas, 1894, every day; he even went into her room; he said to her in exact phrase, "You are a fine pianist"; he preferred to hear selections from Faust; he said that was the sweetest he ever heard; other pieces were played; "Longing" was one—quite a dreamy piece, soft and sweet in the major key; he did not like classical music; Faust was his favorite; one piece, "Love's Sorrow," was his especial favorite; it comprised about four pages of music, two verses, sad and sweet; she sang it three or four

times, a very sweet little song—he liked it so much; they were alone, she and Dr. James; he said that she sang that beautifully and he picked up the music and kissed it; on December 24, 1894, she went into his back parlor at about half-past 9 o'clock in the evening; he had a fire, she sat beside it; he said, "Little one, I did not think I was capable of loving as I love you; will you marry me?" "I said that I had never thought of marriage; he kissed me." She said she had never thought of marriage; he had kissed her on the forehead and he said when she gave this evasive response to his proposal that "if his devotion—if his life's devotion would make her happy he would do so"; he knew that he was an old man but he had a young heart; she made no reply to this except that she would consider it and talk with Mrs. Milen; she saw him again the next day, Christmas, at about 10 o'clock in his office, where she went to take treatment, but she did not take treatment; he took out of a drawer a beautiful gauze fan and said, "There's your Christmas present"; she said, "Thank you, Doctor"; some one then came in and she left the room; at about half past 12 o'clock on the same day, at about the hour of noon, Dr. James came into the room of the Milens and asked if they had any engagement for dinner; they said that they had not, whereupon he invited them to join him, and Mrs. Milen responded, "Certainly, with pleasure"; the three—the two ladies and the doctor—dined in his room at 3 o'clock; afterward she played and sang in the parlor; they sometimes went to the theater escorted by him; he asked her continually to answer his question about marriage; she said that she would write to papa—Dr. Milen—about it; her father was then in the mountains; finally Laura answered her persistent wooer on Sunday, January 6, 1895, in his office in the afternoon, about 2 o'clock; she was at the piano and he opened the folding parlor doors and asked her to come into the office as he wished to speak to her, and she went in; he asked her if now that they—she and Mrs. Milen—had heard from papa if she would not answer his question; she said that having thought of it she would marry him. Dr. James then said to her, "Will you marry me at once?" and she asked him how that could be; he said, "By contract"; she inquired of him as to the nature of a contract marriage, and he explained that

it was according to law, it was the legal way, and he was opposed to ministers as they were all frauds and he did not wish to be married by one of them; he said that the contract was legal in this state of California, and she asked him how it was done, and he said by writing some words and signing the names to it and the contract bound the two together; she said to him, "Well, if you say so I will"; then he said, "Well, we will write it at once, and I want you to write it"; she asked him, "Why?" and he answered, "Because I want it in your handwriting so I can carry it myself"; she went over to the desk then and sat down and he produced the pen and paper and ink; he dipped the pen in the ink himself and he handed it to her and she wrote at his dictation the memorable memorandum of matrimony; at the time of testifying she could not remember what he said; she testified on December 10, 1896, but she wrote the contract on January 6, 1895; he signed his name and she signed her name; he had the paper in his desk; when the writing was completed and signed, he said that she was now his wife; he then took the paper and tore it off the tablet and put it in his pocket and said that he was going to carry that next to his heart; he placed it in his pocket on the left-hand side; she did not know whether it was in his vest or coat pocket, but thought it must have been in his vest pocket; when he proposed to her he drew her to his lap and kissed her; she weighed then one hundred and ten pounds—he was taller and heavier; at that time her stepmother, Mrs. Milen, was at the matinee; after the proposal they went to dinner; Dr. James and she went to dinner at the Creamerie on Market street, opposite Grant avenue; they returned in about an hour; Mrs. Milen came in about one hour afterward and the three had a conversation in his back parlor between 6 and 7 o'clock; this was after the acceptance of the proposal; she told the doctor that she had informed Mrs. Milen of the fact that they were married by contract and her stepmother expressed herself satisfied if she was; afterward on that night, at about 10 o'clock, she retired first to the chamber in the rear of the back parlor and went to bed; into the same came the doctor and slept with her that night, January 6, 1895, and every night until that preceding the day of his death; on the morning of that day, January 28,

1895, at about 4 o'clock she. was awakened by him; he complained of a pain in the shoulder; he said he had a like attack a year previous and he did not think this one serious; he took some of his own medicine and would not let her go for a physician; she arose and heated some water in a teakettle at the fire in the grate in the back parlor and got some hot cloths; on the evening of that day she and Mrs. Milen went to dinner at the Creamerie at about half-past 8 o'clock and returned in about an hour, or at half-past 9 o'clock; before they went out she asked him if they should bring him anything and he said, "No," that he could not eat; when they returned she asked him how he felt and he replied that he felt much better; she asked him if he wanted anything to eat and he said "No"; he died at about 11 o'clock that evening while sitting in his chair in the back parlor; he just gave a gasp and died; could not find a doctor; a doctor came in afterward and the undertaker was sent for; she did not embrace the dead body; the body was laid out in the front parlor after embalmment; he was buried about the third day after death, Wednesday or Thursday; she attended the funeral with Mrs. Milen and wore a mourning dress, rode in the carriage next to the hearse, threw a flower into the grave; after the burial returned to the house and remained in their room— Mrs. Milen's room—stayed in the house all day; her father was in San Jose, he came back next day, remained over night and then returned to San Jose; she slept with them that night; Dr. James presented her with several articles of apparel from the 6th of January, 1895—a pair of shoes, dresses, chemises, and some skirts from a trunk; this was after marriage; he gave her a ring, band ring, gold, heavy—too large and heavy, for her; this was just after the contract was signed; she wore it a few days and then told him it was too large and heavy; he said he would take it and have it fixed; he then handed her a small ring, about a week after; he gave her another ring with a blue stone; she never wore the ring because she did not like it; after the marriage by contract on the 6th of January, 1895, had intercourse with him on the first night and three subsequent nights, so far as she could remember, and slept with him every night until the night preceding his death; she first had menses when she was twelve or thirteen years old; menses became ir-

regular in or about January, 1895, and at that time Dr. Terry came in first to see her and Dr. James told him that she seemed uneasy because she had not had her menses; Dr. Terry felt her pulse and said it was nothing but a cold; Dr. James said in so many words, "My wife seems uneasy because she has not had her menses"; she was introduced to Dr. Terry and others by Dr. James as his wife; when he was about to be buried the undertaker wanted to bury him in his clothes, but she insisted on a shroud; she attended his funeral and was accompanied by her sister and their stepmother, Mrs. Milen; she wore mourning and continued so to dress for over a year; the baby was born on the 16th of September, 1895, she was unconscious at the time of the birth; she noticed the baby; it seemed to be sleeping all the time; the finger-nails did not seem to be fully developed; after she got up, in about three weeks, the child seemed to be more wakeful; Dr. James was the father of that child; during the period of their marriage he had no office hours; he remained at 925 Howard street; he passed his time with her; he passed his evenings with her always; when the rooms were locked up immediately after the death of Dr. James the keys were given to Maria Mangan; she did not know when the piano was taken away—it was a rented piano, an upright, upon which she used to practice three or four hours a day; she told Mrs. Milen she was married by contract; they went to dinner at the Creamerie "because they wanted to"; she knew he had a cook in the house, Maria Mangan; he had no regular hour for dining; she did not remember when they retired on the evening of the 7th of January, 1895; he arose earlier than she did on that morning and brought her breakfast to her bedside; Maria Mangan made up the rooms; she cooked the breakfast in the kitchen—Maria did the cooking, same on the 8th; after she arose she went into the offices; she never told Maria that she was married nor did she know that the doctor communicated that fact to his cook, housekeeper, and maid of all·work, Maria Mangan; "Maria did all the work"; the bride remained at home all day each day; she did not stir abroad during these days; when her husband was taken ill he was in bed with her; she arose and built a fire in the back parlor and prepared and applied hot cloths to his shoulder where he complained of pain and she waited upon

him all day; she did not.go to the theater that day nor did any member of her family; she went to dinner at the Creamerie that day because she wanted to go out to dinner that day; she first learned that she was pregnant when she missed her menses; her father was informed by telegram by Mrs. Milen; she afterward entered the rooms of Dr. James; she took possession of the rooms in March by advice of Mrs. Milen and General Hart.

This is in brief the story of Laura as to the courtship and marriage, the consent and the contract, the consummation and the cohabitation—all covering from the inception to the temporal termination, little more than a month; the first meeting on the 13th or 14th of December, 1894; the catarrhal treatment daily thereafter, and the tentative tenderness and increasing interest in her exhibited by him until his proposal in his office by the fireside on the eve of Christmas, 1894; her discreet evasion of an immediate response to his ardent avowal of affection and continuance of the case until she had opportunity of consultation with her absent father and her present stepmother; the result of advice and deliberation; the culmination of the courtship in the contract on January 6, 1895; the marital assumption immediate and continuous thenceforward; the end—January 28, 1895. If this outline express or indicate the facts in proof, marriage is established as alleged.

It is claimed that the contractual relation has been proved, and that under it the decedent and his surviving spouse (1) lived together in the same house, (2) ate together at the same table, (3) slept together in the same bed, and (4) introduced and recognized each other as husband and wife. Proof of these facts is prima facie evidence of the assumption of the marital rights, duties and obligations, and is the grand total of marital relations expressed in the term "cohabitation" from which marriage may be presumed.

How have these facts been proved? It is said (1) by the positive testimony of witnesses as to seeing the contract on January 6, 1895, and (2) by the testimony of the admissions made by deceased to certain persons at different times.

We have outlined the testimony of the surviving principal to this agreement, and she is supported primarily by her stepmother, Mrs. Milen, whose name in full as given by her under

oath is Jessie Luella Orrell Milen; she first saw the deceased, Dr. James, on December 12, 1894; the next morning she introduced her stepdaughter Laura to him—that was on December 13, 1894; the terms of the introduction were, "Dr. James, this is Miss Milen"; the stepmother first ascertained the business of Dr. James the night they went there; she heard Dr. James talking to her husband; the deceased said that he was a specialist in catarrh and cough trouble; after the introduction Dr. James became very attentive to Laura; he was always following them around; he gave them no peace—in fact, he became to the stepmother almost intolerable as a nuisance, so persistent was he in his cupidous chase; he would come to the door of their room and make some excuse for calling—ask them to play some music; ask if they did not want to go to dinner or to the theater, or to visit and keep him company as he was lonely:

"Right thro' his manful breast darted the pang
That makes a man, in the sweet face of her
Whom· he loves most, lonely and miserable."

Dr. James was especially fond of music, seemed to dote on the renditions of Laura; his favorite was "Love's Sorrow"— he liked a dreamy piece, soft, sad and sweet; he made her sing the same love song several successive times, he liked it so much, and she sang and played on, and still he seemed not surfeited with this food of love, and for him it seemed as he listened to the melody and contemplated the "happy melodist, unwearied, forever singing songs forever new," that

"Love took up the harp, and smote on all
the chords with might;
Smote the chord of self, that, trembling, passed
in music out of sight"

into the heart of this ancient and ardent lover, whose rheumy eyes were moist with emotion as he picked up the sheets of music and passionately kissed them, complimenting Laura on her beautiful vocal and instrumental execution, and, verily, she did execution upon her admirer when she chanted for him again and again his favorite selection that seemed to give "a very echo to the seat where love is throned" and dallied with the innocence thereof in his old age.

Mrs. Milen had several conversations with Dr. James with reference to Laura, one on December 26, 1894, in the front parlor, Laura being present; he said, "I want to marry Laura." Mrs. Milen told him she would not consent because Laura was such a frail girl physically that the stepmother did not think she ought to marry; Dr. James then asked Mrs. Milen if she would write to her husband, Dr. Milen, and intercede for him; she would and she did, and she received a response in these terms ("Mrs. James' Exhibit 7A"):

"GOLDEN EAGLE HOTEL.

"Spelman & Son Proprietors.

"REDDING, Cal., 12, 30, 1894.

"DEAR WIFE: Your surprise letter of Saturday noon is just here.· Pet I wish I knew what to do for your leg but I do not. The trouble is with the ovary certainly, just keep on trying is all I can advise. Well I don't know what to think of Dr. and LAURA. I can easily understand the Doctor, for any one could love her and could not help being kind to her, and there is no question about her doing her part as a faithful wife, but Pet what does she get in return, money is all very nice but money without love and respect on her part. I am afraid will not bring happiness and again JESSIE, you know a wife expects certain duties from a Husband and if he is unable to perform those duties (or only in a way) the wife is soon dispondent. LAURA is not amorus and never will be yet she will have her passions and if not satisfied she will soon disslike her husband, you two must talk over this matter plainly, use plain language, reason every way. LAURA is of age and can do just what she pleases, but be sure she understands well, JESSIE, what married life means. One great advantage to a young Girl in marrying an Old Gentleman such as he is. She would be treated kindly she would be cared for. Well, you two must do as you think best. I dont know what to think is best.

"Pet, if your leg is no better and you have told the Doctor the Ovarian Cause of it and he cant relieve it send for Doctor PRESTON or GIBERSON dont wait any longer. I am free to acknowledge that I am not sure what will stop it, and I will be glad to find some one that does know what to do for it.

"Well, I got an other beautiful nose didy last evening in a handsome didy box nicely inscribed in some foreign Language so it must be imported (the box) I think from EGYPT for it speaks of Corn on the box, and then it says Plasters, I suppose that is some City in EGYPT. Well I have so many silk handcherchiefs now that I have to count them two or three times per day to see that they are all here. I will soon have to carry an extry man to look after my baggage for its has increased wonderfully, when I come here I only had one pair of socks, now I counted them and there is three pair and four silk handerchiefs besides my big black one, but since I have a box to put them in they will be easier to look after.

"You ask why we did not stop at the Temple? on account of those exposed stairs persons would hesitate about coming to see us when all the loafers could see just who did come, here the stairs is not so long and don't pass through the Office, the People here are very nice and kind. I don't believe I told you yet that I am well I feel just splendid and am getting to eat quite natural again.

"We expect to remain here until about Jan. 7. I do hope my Pet is well by this time, I will not send you any money again until perhaps Thursday. I will try to get some to you by the time the scraps of your last purchase is used up.

"Lovingly yours,

"THEO."

On the afternoon when she received this letter from her husband, who was then in Redding, California, she saw Dr. James and showed him the letter and he read it; in about an hour and a half afterward Mrs. Milen saw him in his office in the back parlor and they had a conversation upon the topic of the letter; he said, "I love Laura and want her to marry me, and I wish you would intercede for me." Mrs. Milen told him to do his own courting; he was very gallant toward Laura; Mrs. Milen remembered the 6th of January, 1895, when Dr. James came to her room and said, "Here's a dollar and a half; you and Mrs. Dickman go to the matinee at Morosco's and afterward to the Creamerie; the matinee is very good—Laura and I were there yesterday." Mrs. Dickman and Mrs. Milen went to the matinee and returned at about 6 o'clock; on the same evening, in the front parlor,

Laura told her stepmother that she was married by contract to Dr. James; Mrs. Milen said, "Is that possible?" and opened the folding doors to the back parlor and saw Dr. James and had a conversation with him about 7 or half-past 7 o'clock; Mrs. Milen said, "What about this contract? I do not understand it"; Dr. James said that it was just as good as though a dozen ministers or priests had performed it. Mrs. Milen then took the paper and read it thrice to herself and became convinced. Laura slept with the doctor that night; they retired at about 10 o'clock; before retiring they had some lunch in the back parlor; Dr. James said that he never believed he could be so happy; Mrs. Milen slept on a sofa in the back parlor; from that night on until he died Dr. James slept with Laura; although she did not see them actually sleeping together, but she saw Laura in the same room and in the bed in that room. Dr. James appeared perfectly well until just before his death; he first complained of feeling ill at about 8 o'clock on the morning of the 28th of January, 1895; Mrs Milen was with him when he died and Laura was there also; there came in also Mr. and Mrs. Dickman, Maria Mangan, and a Miss Coon; others also; the death occurred at near 11 o'clock in the evening of January 28, 1895; Laura insisted that he should be buried in a shroud; Mrs. Milen told the undertaker that herself and her stepdaughter, "Mrs. James," would be responsible for the shroud; the undertaker said that the administrator wanted the doctor buried in his clothes, but Mrs. Milen and "Mrs. James" insisted that he should have a shroud, and it was so done; Mrs. Milen first saw the marriage contract after the death of Dr. James when Mr. Shadburne, the attorney for the absent heirs, and Mr. Cluin, clerk for the administrator, and Mrs. James were present, and General Hart finding the contract in the desk took it out and handed it to Mrs. James and she took it and grabbed it to her bosom, and then Mrs. Milen took it out of her hand; this occurred on the 25th of February, 1895; the desk had been sealed and the room locked; neither Mrs. James nor Mrs. Milen had a key to the room, nor had access to it from the time the administrator took possession until the day of this discovery in the desk, February 25, 1895; Dr. James was very devoted to Laura—kissed her, called her pet names, "my love," "my

darling," "my little wifey," and "little one"; he called her by these endearing epithets continually. Mrs. Milen did not know the height of Dr. James; he had blue eyes, white hair and mustache, face white, beautiful complexion, perfectly clear; baby's blue; forehead high, light brown hair with a reddish tinge, quite full under the eyes, heavy crescent line under the eye; round face, chin with slight dimple, short round arm, little fat hands; long body and short limbs; hair rebellious; Dr. James had a high, broad forehead, blue eyes, heavy line under eyes very full; very deep line running from the nose toward the temple; large mouth, round chin with a slight dimple; rather a short, fat man; the baby was born on the 16th of September, 1895, in the back parlor; Mrs. Milen saw the baby five minutes after the birth; Dr. Walton Preston was the doctor; Dr. Milen was there also; Mrs. Milen noticed that the child's finger and toe nails were not fully developed and the legs from the knees down were not fully developed; understood that the undeveloped condition of the child's nails signified premature birth; it was three weeks short of the full time; at the time Dr. James became ill he complained of pain in his shoulder and in his heart; Dr. James died at about 11 in the evening and Mrs. Milen was present at the time; she had been in the room at about 7 o'clock; she dined that day at the New Creamerie with Laura; they were gone to dinner nearly two hours; Maria Mangan was in the house; when Mrs. Milen and Laura returned Dr. James was in his room alone; at the time of his death the so-called "Indian Doctor" was there; Mrs. Milen did not know by whom this "Indian Doctor" was called in; he lived hard by the house of the deceased; it was not Maria Mangan that suggested a shroud—it was Laura, "Mrs. James"; the undertaker called at the house after the death and said that his bill had not been paid; although she had told the undertaker that herself and her stepdaughter would be responsible for the burial bill, they did not discharge that debt; the administrator paid it and the bill was rendered to the estate of deceased; Mrs. Milen was present when her husband met Dr. James after her husband had returned to town; Dr. Milen shook Dr. James by the hand and congratulated him, saying, "I believe you are my son now," and Dr. James

made appropriate acknowledgment and response affirmatively; Dr. Milen had learned of the marriage from his wife's letter to him; Mrs. Milen sent a telegram to her husband in San Jose about the 13th of February, 1895, in which she said, "Laura is pregnant; what shall I do?" Dr. James had made many presents to Laura—articles of apparel, rings, silk chemises, handkerchiefs, skirts, green silk, black silk and white, and on New Year's Day, 1895, he knocked at their door and he said to Mrs. Milen, "Here is your New Year presents," handing to Laura a dress, which subsequently she had made up, and to Mrs. Milen he gave a black silk dress.

It is claimed by counsel that these recited attentions paid to Laura prior to January 6, 1895, and the gifts bestowed upon her and her stepmother indicate that he intended to marry her, and especially when his attentions to her were exclusive, and it was not his habit to make presents, for Dr. James, even when he listened to the joyous "melodies of love," and though on marriage he "was bent he had a frugal mind" and did not care to spend a cent. This point is relied upon to show the probability of petitioner's pretensions, for this close and penurious man who, according to a witness, Maria Mangan, adverse to this claimant, was willing to sell his deceased wife's clothes, who gave no presents to anyone, presented Laura with valuable garments to be worn next her person, a certain token of affection, and he placated his prospective mother in law, Mrs. Milen, with a rich silk dress; he was exceptional in his attentions to this attractive little woman, showing extreme devotion to her, giving to her and her stepmother dainty luncheons of cheese, crackers, pickles. and sour wines; taking them to dinner and the theater. These marks and manifestations of fondness showed that he must have contemplated marriage prior to January 6, 1895— contemplation culminating in consummation on the evening of that day. So the counsel for claimant considered that they started out in this case with circumstances constituting a hypothesis perfect in its proportions and paragonal in its probability, supported by proof positive and plenary of the existence of the contract and of the declarations made by the deceased, Dr. James, that he was married to Laura Milen, and, the counsel claims, this evidence came from unimpeached

sources through unpolluted channels. One of the sources is
Dr. Theodore Milen, the father of the petitioner Laura, a
peripatetic physician earning a scanty subsistence out of a
precarious practice, "on the road," as he testified, sometimes
utilizing the natural gifts of his young family in vaudeville
entertainments or interludes, while he lectured on diseases
peculiar to the sexes, and treated cases chronic in their
nature arising from excesses and vended nostrums calculated
for their cure. In 1894 the family of Dr. Milen changed
their abode several times, and in December of that year he
was engaged in his itinerant occupation at Oroville, Red
Bluff and Redding, in the northern part of California; at
Redding he received a communication from his wife and also
from Dr. James; the purport of Dr. James' letter was that
he asked for Laura in marriage. Dr. Milen did not answer
the letter of Dr. James but he did answer that of his wife to
the same purport; Dr. Milen spent hours in writing that let-
ter, which, by the way, consists of less than three pages of
ordinary letter-cap and contains about four hundred and
seventy words; Dr. Milen left Redding January 11, 1895.
for San Francisco, and went to 925 Howard street, and met
his wife and "Mrs. James," and he met Dr. James that same
evening in their room—that is, the room of the Milens; at
about half-past 7 o'clock in that evening the decedent came
into the room; Mrs. Milen had a lunch prepared—tamales
and beer or wine, crackers and pickles; when Dr. James came
in Dr. Milen said to him, "Doctor, I suppose this is my son,"
to which Dr. James answered, "Yes, if this is your daughter,
for she is my wife"; then they partook of the lunch; they
remained about one hour and a half—that was the evening
of January 12, 1895; Dr. Milen met Dr. James the next
evening, Sunday, the 13th of January, 1895, in the back
parlor, Dr. Milen's wife and daughter present; Dr. Milen
asked Dr. James, "Doctor, how about this marriage con-
tract? My people are old-fashioned Methodists and won't
understand it, and I understand this is not legal outside of
California"; he had previously requested Laura to leave the
room and she did so; Dr. James pulled out a paper, this
contract, and Dr. Milen read it twice over himself; Dr.
James said he would provide for "the little one," as he

called her; the next morning Dr. Milen took to the road to practice medicine at San Jose; at that time Dr. Milen received a paper known in this record as "Mrs. James' Exhibit 8 and 8A," envelope containing letter inclosing a Wells-Fargo money order for $25; the letter was dated January 16, 1895, and signed "Chas. A. James"; the envelope was addressed "Theodore Milen, care St. James Hotel, San Jose"; Dr. Milen did not answer this letter, but he preserved it; it may be remarked that he did not preserve the letters he received at Redding; on the same evening of the receipt of the letter and money order at San Jose he came to San Francisco and went to 925 Howard street, returning to San Jose the next morning, and remained there until he heard of the death of Dr. James, on the evening of the 29th, when he "immediately came home." Dr. Milen did not remain for the funeral because of his business in San Jose, which, though not lucrative, necessitated his personal attention; after he received the telegram announcing Dr. James' death Dr. Milen came to San Francisco and remained that night, 29th of January, 1895, and slept in the same room and in the same bed with his wife and daughter Laura; returned next morning to San Jose and remained there until February 8, 1895, when he came back to San Francisco and learned that the public administrator had taken possession of the estate of Dr. James.

Dr. Milen bestowed all the care that he could over the books and education of Laura; he never gave his wife any special instructions about the moral culture of his children; he considered that his wife was competent to care for them in that respect, and he did not think it necessary to dictate to her in the matter of their intellectual and ethical training; in 1894 Laura was past eighteen years of age, Lulu was sixteen years of age, Mrs. Jessie Milen, their stepmother, wife of Dr. Milen, twenty-five years of age; Dr. Milen's first wife died in 1887; he married again in 1890; his second wife, the present Mrs. Jessie Milen, had been previously married to one Milo Harris, when she was sixteen years old, with whom she lived for a year or more and of whose current existence she entertains dubiety; both Dr. Milen and his wife Jessie regarded with aversion the form of marriage by

contract, as they believed in a marriage by a priest or minister—although Mrs. Milen did not belong to the same faith as her husband's people, she was not an old-fashioned Methodist, and she had never heard of a marriage contract before, and had an antipathy for such a connubial contrivance, yet they accepted implicitly the assurance of Dr. James that it was all right and that even an oral agreement would suffice; Dr. Milen had sentiments of repugnance to this kind of marriage, and thought it was not proper, although he was informed it was legal in California, and so he acquiesced; at the time of his second marriage in St. Charles, Missouri, on February 1, 1890, Laura was about fourteen or fifteen years of age, Lulu about three years younger, his wife about twenty or twenty-one, himself about thirty-six years of age; that constituted his family. Shortly after that marriage his wife took charge of the children and she says she cared for them and guarded them as if they were her own children; she made companions of these two children rather than daughters. To the best of his ability Dr. Milen had used every effort in the education of his daughters for their moral and mental culture; he had tried to throw around them every influence for good, and he had never known of any evil environment about Laura during all the time up to what he claimed to be her marriage; he knew that his wife was the author of a book which he had seen but not read, the title of which was and is, "Was He to Blame, The Temptress, by Orrell," "a story of love and passion," and containing on the title page a supposed representation of an artist painting a female human figure standing upon a studio platform and entirely undraped, with the right arm holding back a curtain and the left covering with its hand the eyes of the model; this feminine form is altogether nude; this pictorial representation constitutes the frontispiece of the book, directly presenting itself to the eye of the observer; on page 40 of the same volume the picture is repeated; other pictures appealing to a concupiscent imagination, without any excuse in the abused name of art, are interspersed in this paper covered and bound collection of printed sheets numbering one hundred and sixty-eight pages, and supplemented by an advertisement of "a sure, safe and speedy cure for all

monthly irregularities (from whatever cause), no instruments used," and so on, by "a true friend of her sex," one "Mrs. Dr. Gwyer, 311½ Hyde street, San Francisco, Cal."; added to this on the next page is another advertisement of Dr. Santé's Grains of Strength French Cure "for certain specified sexual ailments," winding up with an injunction to "Use Dr. Foulet's Prophylactic Powder" for female complaints. Dr. Milen did not know whether this book or its manuscript was open to the inspection of his daughter while his wife was engaged in its composition; Mrs. Milen was a long time writing it; she was writing nearly all the time; there was no secrecy about the writing of this volume; his daughter might have seen it. Mrs. Milen testified concerning the publication of this work that she sold the manuscript to the Bancroft Company for $100 to their agent, a Mr. Packer, in their printing house on First street in presence of a Mr. Shahan, who took the written matter and Packer paid her at her house on Valencia street; Shahan was the manager of the printing department of the Bancroft Company, and he says he was present when Mrs. Milen sold the manuscript to Mark M. Packer, and that the name "M. M. Caine" in the copyright was put in by Packer, the initials "M. M." standing for his own initials and "Caine" being his mother's maiden name— a rare mark of respect for the memory of one's mother! Since the time of the mother of the first Cain it may doubted that any such mark of filial veneration has been bestowed upon a descendant of Eve; but the reason for this was assigned clearly and cleverly by Mr. Shahan; it was to elude the vigilance of the Society for the Prevention of Vice, whose agents were on the trail of such publications, and by the direction of Thos. A. C. Dorland, now deceased, then general manager of the Bancroft Company, false entries were made in the books of that concern, in presence of Shahan, and Packer purchased the pictures for the book, with the publishing of which Mrs. Milen had nothing to do. Dorland is dead and Packer was not produced at the trial, and Shahan has not been with the company since 1894. Dorland being dead and Packer not produced, we have on one side statements as to this transaction by Mrs. Jessie Milen and Shahan, the latter corroborating her as to the sale of the

manuscripts but not as to the actual payment of the price, and, on the other side, we have testimony from the engraver. Andrew C. Cunningham, who says that he reproduced for Mrs. Jessie Milen from a photograph the engravings in the book, and that he understood that it was a picture of her stepdaughter Laura; Mrs. Jessie Milen gave to Cunningham the order for the photographic reproduction; the figure was nude and represented the form of Laura Milen; the engraver was given the order by Mrs. Jessie Milen to make those licentious pictures to illustrate this book; she told this engraver that the form in the photograph was that of her stepdaughter Laura; the features of the face in the pictures are covered by a hand, thus partially concealing the countenance; Mrs. Jessie Milen denies that she furnished the photographs, and denounces Cunningham's testimony as totally false, and she similarly stigmatizes the entries in the books of the Bancroft Company, produced and identified by Mr. Weir, the bookkeeper for the incorporation, which show that on August 3, 1893, she was debited with one thousand novels, $100, and credited with four payments on account, $50+20+10+10= $90, leaving a balance due to the printing company of $10, still due and unpaid. This book was considered so obnoxious, morally, that Francis Joseph Kane, agent of the Society for the Suppression of Vice, confiscated all that he could find in the book stores because of the salacious character of the contents. Laura denies that any photograph of herself was furnished for the preparation of the engraving in this book, and says that she first saw the volume in Dr. James' back parlor, when she was in there with Mrs. Milen; Dr. James took it from a drawer and asked Mrs. Milen if she had ever seen it and the answer was "Yes, I am the author"; Laura had never seen it prior to that time nor had she up to date read it; she never read the proofs nor manuscript of her stepmother's novels; her stepmother was always writing; but Laura never took any interest in what she was writing nor evinced any inquisitiveness about it, and her stepmother was very particular about keeping it to herself; she kept her own counsel as to her literary compositions and did not employ Laura as an amanuensis or corrector of proofs. Mrs. Milen says that the illustrations for the book were obtained by Dr.

Milen from an artist named Cunningham; Shahan says the pictures were purchased by Packer; Dr. Milen never read the book but says there was no secrecy about it; Mrs. Milen says she always observed secrecy as to her manuscripts, and carefully concealed them in a drawer of her desk and locked it, and that her stepdaughter had no opportunity of seeing any portion of her manuscripts, and that they heeded her behest not to read her writings; there is testimony of George Hudson and Miss Charlotte K. Clark at variance with this suggestion of secrecy, but apart from their evidence there is in the Milen-Shahan statements a medley of contradictions hard to reconcile; the whole circumstance, however, in the opinion of counsel for petitioner Laura, is sheer hearsay, and should not have been admitted in evidence; it is immaterial and, moreover, the groundwork of the book is not immoral. It may have a profound moral purpose for the propagation of purity of thought and action, but if that be its intent it is too deep and obscure for the carnal sense to penetrate; it is essentially a bad book, a bawdy book; the letter-press written up to the lascivious engravings; the tenor of the text turgid and tawdry; the composition execrable in every respect— cheap, course, ungrammatical; and, assuming it to be original in conception, it is ineffably vile in matter, manner and execution; and this book, which she and her stepdaughter say was guarded while in process of construction under lock and key and which Dr. Milen says there was no secrecy about, was written by a woman to whose care was committed the mental and moral culture of two young girls, and in whom their father had complete confidence as to her competency to rear them and who suffered no evil environment to encompass them. All this is asserted to be immaterial by counsel for the claimant Laura, but it must be remembered that it was drawn out by him in his endeavor to show from the mouth of his own witness, Dr. Milen, that the domestic training of his children in the family of which Mrs. Jessie Milen, their stepmother, was the head was in the highest degree moral, and that, while he was engaged in his doctoral divagations up and down and around about the country, Laura and Lulu were committed to the care of his wife, who guarded them as if they were her own children. It is claimed by

counsel for petitioner that the contract writing itself is established as existing on January 6, 1895, by direct and positive testimony of the three witnesses, Laura, Mrs. Jessie Milen, and Dr. Milen, and that their evidence is corroborated by admissions made by decedent to Dr. Parshall Adam Terry on the 13th of January, 1895, that he was married in this manner. Dr. Terry testifies that he saw Dr. James on the 23d of December, 1894, at the decedent's house, 925 Howard street, where he went to buy medicine of him. Dr. James introduced him to Mrs. Jessie Milen and Miss Laura Milen, now Mrs. James; on January 13, 1895, Dr. James called at the office of Dr. Terry, then at 788 Harrison street, and told Terry that he was married to that young lady by contract. Dr. Terry called at 925 Howard street that same day and met Dr. James there and he called this lady into his office and he said, "Dr. Terry this is my wife, Mrs. James," and he said to her, "My little one, this is my old friend that you have heard me speak of, Dr. Terry." This might be considered a somewhat superfluous formula, if it be taken as true, as testified almost in the same breath by Terry, that at the same place just three weeks before, precisely twenty-one days, he was introduced to Laura by Dr. James. To that extent the introduction should seem to be unnecessary, except, perhaps, for the purpose of this case it might have been deemed essential for the sake of emphasis; but however that may be, Dr. Terry wished her joy and congratulated her on having so good a husband. Dr. Terry saw Dr. James again on January 20th. On January 20, 1895, Dr. James called on Dr. Terry at his office, 788 Harrison street, and asked him to call and see his wife as she was ill. Dr. James did not suppose much was the matter with her but she was "grunting" and he wanted Dr. Terry to visit her. Dr. James said he was in hopes that she was in the family way as that was the reason he married a young wife, that he might have an heir. Dr. Terry went to see her. Dr. James had admonished him not to give her any medicine or anything to cause any derangement of her system. Dr. Terry saw her in the bedroom in bed in her night clothes, under the bedclothes; felt her pulse, looked at her tongue, and said to Dr. James, "Doctor your wife has only a little cold, and a little quinine is all

she needs, and, now, that you have such faith in your remedy, is a good time to apply it.'' After that incident Dr. Terry never saw Dr. James again. On the 16th of September, 1895, Dr. Terry had occasion to call at the house, 925 Howard street, to see Dr. Milen about manufacturing the medicine that Dr. James used to make, and there saw a babe that had the appearance of a child just born; its nails were not fully developed; the nurse took the babe out of the bed and by Dr. Milen's request exhibited it to Dr. Terry; the mother was lying in bed; the nails were four-fifths long, all the way to the end of the fingers; Dr. Terry had never seen a fully developed child with nails like that before since the beginning of his medical studies in 1841; with the exception of this child, he could not recall any infant with short, undeveloped nails who lived; this child looked healthy; Dr. Terry never dined with Dr. James nor took a meal with him; he usually visited Dr. James on Sunday and went to buy medicine for his asthmatic trouble; Dr. James was in excellent health and spirits at the time he visited Terry January 13, 1895.

As to the visit of Dr. James to Dr. Terry on Sunday, January 13, 1895, testimony comes from George Elisha Terry, son of the latter, who appears to have been providentially present when the visitor came in and said to father, Dr. Terry, ''I have good news to tell you; I have been married.'' The elder Terry said, ''Well, I have seen nothing about it in the papers,'' to which Dr. James made answer, ''I was married by contract, which I consider better than a marriage by a notary or minister, as I don't want publicity in my affairs.'' Dr. Terry inquired, ''Who is the fortunate lady?'' Dr. James replied, ''Miss Laura Milen, the young lady to whom I introduced you.'' Dr. Terry responded, ''I congratulate you on marrying a young lady who will take care of you,'' to which Dr. James retorted, ''Oh, no! I don't need anybody to take care of me; I can take care of her.'' So the Terrys chimed in with each other as to the eventful interview of January 13, 1895.

In further fortification of the case of petitioner, and to clinch, as it were, the demonstration of the declarations of decedent, two witnesses are presented, George Williams and John Bigby, the first of whom testified he knew the deceased

for about twenty-five years back, and that he met him a week or two before he died on Howard street, near Fifth. Williams was with his friend Bigby, and the two met Dr. James, to whom he introduced them as Mrs. James; the incident of this introduction was testified to by Bigby, who put it, however, "as the forepart of January, 1895." The deceased said, "Mr. Bigby, this is my wife, Mrs. James." The claimant here differs somewhat in her relation of this imputed introduction; she speaks of two young men as the persons. Both Mr. Williams and Mr. Bigby are old-timers; one came here in 1855 and the other crossed the Isthmus of Darien hither bound in 1850 or 1851; the latter described Dr. James at the time of the introduction, "forepart of January, 1895," between 12th and 15th, as pretty gray—in fact, he was pretty gray in 1887 or 1888, when they first met; gray mustache "like mine now"; light brownish complexion, hair perfectly white, in 1887 or 1888; the same man that he was then introduced to he met as related in January, 1895; neither Williams nor Bigby could be accused of being young men at that time; indeed, they were well along in years.

These items of evidence with the statement of Mrs. Lulu Blanche Dickman that Dr. James asked her about a week before his death, "Has Laura told you of our marriage?" to which she answered "Yes," constitute the sum total of affirmative declarations of the decedent; and it is stoutly contended by counsel for claimant that they afford irrefragable proof of the marital relation, in conjunction with the contract and its concomitant and consequent circumstances; they cannot be overcome by contrary conduct and by negative declarations; the status once established is forever fixed, and cannot be gainsaid by any quantity of declarations or any amount of acts of decedent that are inconsistent therewith. He told Dr. Terry on the 13th of January, 1895, that he did not put the notice of the marriage in the papers nor have it celebrated by a notary or minister, because he did not want publicity in his affairs, and then, within a day or two, "the forepart of January, 1895," between the 12th and 15th, he introduces her publicly on a main thoroughfare to Bigby and Williams. Counsel for claimant concede that contradictions have arisen in this case, but insist that the court must esti-

mate the evidence by its own intrinsic weight, and consider the character of the witnesses, their means of knowledge and the possibility of their interest or bias. This is the code rule of evidence; it is also common law and common sense; and is the touchstone of truth in this controversy. Her counsel claim that the case of petitioner is so strong and straight that nothing can move it from its firm base of integrity, and that the defense here is purely mechanical; it is an unsubstantial fabric that falls of its own falsity and fails to shake the solid structure of claimant's case. This metaphor is somewhat mixed and a little rocky, it must be confessed, but, as the same counsel say, there need be no fear that this mechanical defense so founded on false theories fabricated to deceive will effect its object, "for the practical eye of the experienced judge will penetrate this superficial structure and reveal the fact," and, following the precedents made by "the decisions of this court, which are uniformly in favor of justice and humanity," the conclusion of this will be based solely on the facts and the law flowing therefrom. The court accepts the compliment of counsel with customary complacency, conscious that the record will bear it out and that the decision in this particular issue will be no departure from the patterns of the past.

Mrs. Lulu Blanche Dickman tells a long story of the incidents connected with the courtship and circumstances of the marriage, but her husband, Henry Dickman, cuts another facet upon the brilliant tale told by his wife; although Dr. Milen introduced him to his sister in law Laura as "Mrs. Dr. James," Dickman did not take it seriously, thought it was a "josh," to use his own elegant and expressive vernacular. That he took no stock in the combination is quite clear from the telegram he sent to the niece of deceased on the 31st of January, 1895, addressed to "Mattie James, Fort Madison, Iowa," in these words: "Your uncle Dr. James died yesterday at my house. Letter mailed to-day with full particulars. You need an attorney at once to represent you, and I recommend you to telegraph at once to Judge Levy, Nevada Block, to represent you in the meantime. Henry G. Dickman." He also sent letters to Mattie James and a form of a full power of attorney to her, constituting him her agent to do "every

and all things'' in connection with the estate of her deceased uncle, as whose heir he assumed she was entitled to succeed. Counsel for claimant insist that the ''facts are proved by those having knowledge thereof,'' and yet it should seem that this young husband, aged thirty, living continuously in this house during the period from the middle of December, 1894, with his wife, Lulu Blanche, to the date of the death of Dr. James, and ever since abiding therein, did not know that his sister in law Laura was married and never learned it from any source except a casual introduction by Dr. Milen to her, which he treated as a ''josh,'' and that after the death of Dr. James he endeavored to capture the works for Mattie James. It was a very serious situation in that house on the evening of the 31st of January, 1895, the date of the telegram and letter from young husband Dickman to niece Mattie James, in which she was advised that her uncle, Dr. James, had died on the preceding Monday night. According to every other member of the Milen family, there was there a sorrow-stricken widow, in due time, or perhaps prematurely, to become a mother, her sister Lulu, the young wife of Henry Dickman, the stepmother, Mrs. Jessie Milen, all of whom were profoundly moved by the sudden bereavement, and yet Henry Dickman, a member of that household, who had a right to know all that his wife knew of the domestic affairs, and who presumably was one of those persons described by counsel for claimant when he says ''facts are proved by those having knowledge thereof,'' wrote this carefully considered letter in typewritten characters:

''SAN FRANCISCO, January 31st, 1895.
''Mattie James, Fort Madison, Iowa:

''On last Monday night your Uncle Dr. Charles James died at the place in which myself and wife reside. Myself and wife being his nearest friends in the City and County of San Francisco, I thought it would be no more than right to immediately advise you of the status of the matter. I understand that you are his only relative and it becomes therefore necessary that you act immediately. Your uncle died leaving considerable money and as you are his only relative as I understand it becomes necessary that you should have a representative out here to look after your interests. As you

understand the public administrator is already after the estate, so that I have been advised after consulting my attorneys been advised to send the enclosed power of attorney to you, and if you will sign it and acknowledge and send it to me I can protect your interests and save you a great deal of expenses. If you decide upon doing this please sign the said power of attorney and acknowledge it before a commissioner of the State of California and return it immediately, and as I said before being the nearest friend of the Doctors out here I am better acquainted with his desires than any other person. Please let me hear from you immediately.

"Respectfully,

"H. G. DICKMAN,

"925 Howard St.

"San Francisco.

"Received Feb. 4, 1895,
  "M. E. JAMES."

The able and learned counsel for claimant contend that "Dr. James and she who was Laura Milen assumed marital rights, duties and obligations, and these were well evidenced for the short period between the time of marriage and his death. *Her relatives knew of the marriage.*" Now, here is Henry Dickman, the husband of the only sister of Laura, living in the same house, on the very day of the burial of deceased, sending the telegram quoted and this eloquent epistolary exposition of their domestic understanding that the niece, Mattie James, was the "only relative" of the deceased, and advising her of the predatory purpose and pursuit of the public administrator!

The relatives of Laura knew of the marriage, say the counsel, and yet, according to this letter, Dickman and his wife were the "nearest friends" of the deceased and the "better acquainted with his desires than any other person"; they wanted to be empowered to "protect the interests of the only living relative," the niece Mattie James, although there was then in the house whence this document was dated the widow of the "father of the prospective offspring."

"Others knew of the marriage," say the counsel for the claimant. We have considered seriatim Dr. Theodore Milen, Mrs. Jessie Milen, the Terrys, George Williams, John Bigby,

Mrs. Laura Milen James, Mrs. Lulu Blanche Dickman and her husband Henry G. Dickman, and we have remaining upon this point to establish by circumstance the more positive and direct proof three witnesses, the first of whom, John Thomas Currey, testifies that he knew the late Dr. Charles A. James; Mr. James' photograph was recognized by him; Mr. Curry was an acquaintance of Mr. Dickman, the husband of the sister of Mrs. Laura Milen James, to whom Currey was first introduced in January, 1893, at the Girard House in Oakland when she was Miss Laura Milen; Currey had known Henry Dickman in St. Paul, Minnesota; subsequently Currey saw "Mrs. James," Dr. James, Mrs. Milen and Mrs Dickman in the parlor of 925 Howard street on the 1st of December, 1894; saw them together on the 25th of December, 1894, at dinner in the dining-room as he was passing through the hall on his way upstairs to see Dickman; two or three weeks afterward, between the 10th and the 15th of January, 1895, he saw Dr. James, Mrs. Milen and "Miss Milen" in the same dining-room. Currey did not know her then—between the 10th and 15th of January, 1895—as "Mrs. James," nor was he ever introduced to her as Mrs. James; he learned of that from the newspapers; and yet Currey is relied upon to support the contention of cohabitation, introduction and recognition of the decedent and Laura by each other as husband and wife. This is rather thin gruel upon which to support so vital a proposition.

Next we have, as the completing links in the chain of circumstances bringing us down to the last scene of all, the testimony of Patrick Kelly and his pal, Richard Edmund Saunders. Kelly testifies that he was undertaker's assistant for Joseph Hagan, the funeral director and embalmer who buried the body of Dr. James. When Kelly went to the house of mourning he heard a childish voice say, "Oh, my poor husband!" and he turned and saw the young lady whom he identified at the trial as the claimant, and Mr. Saunders, who went to the same place with his friend, Mr. Kelly, testified that he was working at that time for Hagan, the undertaker, and that he was a pall-bearer at the funeral; that he saw Hagan embalming the body; he and Hagan and a man named Williamson, and another man whose name he

could not recall, acted as pall-bearers at the funeral. Mrs. James was weeping; she rode in a carriage behind the hearse; she said, "Be careful, that is my poor husband"; she was weeping very much; this young lady was crying and threw her hands up to her eyes and said, "Be careful, that is my poor husband!" The other two ladies, whom Saunders identified as Mrs. Jessie Milen and Mrs. Dickman, were present.

In connection with this testimony as to what took place at the time of the laying out of the corpse and the funeral, we have the statement in evidence of the funeral director who embalmed the body and who went to the house 925 Howard street upon request and inquired for relatives and was told that there were none. There were four ladies present; he went about the task of preparing the remains; this was on the 29th of January, 1895. At the time of the funeral Mrs. Milen asked him who was to ride in the mourners' carriage. Hagan said that in the absence of relatives the housekeeper would be the proper person. Mrs. Milen said that she did not know who was better entitled than the lady to whom the deceased was engaged to be married. That was the first Hagan had heard of any such person, and he assented to the proposition. This seems to account, in a measure, for the claimant's riding in the carriage next the hearse—a fact by which her counsel sets some store. Hagan saw no signs of sorrow or any wailings or manifestations of woe. No one said, "Oh, this is my poor husband!" This did not occur at any time, Kelly and Saunders to the contrary notwithstanding. These two men assisted Hagan at the time. There was no emotion at all displayed. A short Episcopal service was read by a clergyman, but there was no tear shedding; the ceremony was brief, with no signs of sorrow:

> "Few and short were the prayers that were said,
> And they spoke not a word of sorrow,
> Not a tear was shed, not a funeral note
> As his corse to the graveyard they hurried."

At the time of the funeral George Hudson testifies that he was present; a minister was there who read the service; there were also a Miss Weygant and her mother, Mrs. Weygant, the widow of an old friend and early employer of the deceased; also a Mrs. Sarah Williams, an old friend of Dr.

James and a member of the Hudson household; there were also Miss Maria Mangan and a cousin of hers, and several roomers in the house. Mrs. Jessie Milen, Miss Laura Milen, and Mrs. Dickman were there. Mr. Newell Winants and Mr. George Hudson were the only male friends of the deceased present. Hudson came very early, while they were gathering there, and remained until the body was taken downstairs. There were no manifestations of mourning. When the corpse was being removed from the room Hudson did not hear any ejaculations of any kind; he did not hear claimant say, "Oh, that is my poor husband; be careful!" No such exclamation was made; there were no pall-bearers; the funeral was in charge of the public administrator and the undertaker. At the time of the funeral the ladies, or most of them, were in the front room; at the time of the funeral the ladies, or most of them, were there and the three ladies of the Milen family sat together on the east side of the room, and after the ceremony they retired into their own room, hall bedroom off the parlor; they were not present when the coffin was removed, although they may have been present when it was closed. When the funeral procession was about to form the Milens were standing on the sidewalk and after a short time they took the carriage that followed the hearse. We shall have occasion presently to try the evidence of Mr. Hudson as to what preceded the incidents of the funeral, and now pass to the consideration of other witnesses.

Mrs. Vica Mabel Fitzgerald, a young lady formerly Miss Vica Coon, was one of the roomers in the house at the time of the death of Dr. James. Miss Coon was a working girl, a shoe-fitter by trade, steady and diligent at her calling. She lived in a front room on the third floor, occupying an apartment adjoining that of Miss Maria Mangan, separated by doors usually kept open, and Miss Maria Mangan and she were companions in the evening and usually kept pretty close to their rooms. Miss Coon was out of work when the Milens came to 925 Howard street in the middle of December, 1894; she did not meet them, however, until the 28th of January, 1895. Miss Coon was acquainted with the deceased, Dr. James, from June, 1894, until he died; she was there a few minutes after he died; she had lived in that house from June 17, 1894. There were liv-

ing in the James house, in addition to Miss Coon, Mamie and
Kate Dalton, Maria Mangan, the housekeeper, Mrs. Biro, Mr.
O'Neill, Mr. Ott and the Milen family. Miss Coon usually left
the house at 7 o'clock in the morning and returned at 6 in the
evening. She first met the Milen family after the death of
Dr. James. When Miss Coon went into the room Mrs. Milen
was standing rubbing Dr. James' head and Laura and Lulu
and the "Indian Doctor" were there; Maria Mangan was
there, and some people from the street. Dr. James was sit-
ting by the fire in the back parlor on the right-hand side as
one went in from the front, in an armchair. There was in
the room a sofa, an armchair, a settee, a bed, his desk and a
bureau. He was sitting with his legs crossed and was lying
back dead; he had a wrap around him. Mrs. Milen said that
she and Laura had been at the Orpheum and when they re-
turned they thought they would go in and have a chat with
the doctor, he was feeling better, and they were going to go to
bed and he said he would take some more medicine. Mrs.
Milen went to fix his medicine but he refused to permit her;
he said he knew better how to fix the medicine, and the Milens
said to him that if he wanted anything in the night to call
them, and he replied, "No," that if he needed anything he
would ring the bell for Maria. There was a small bell on the
mantel which Laura picked up and rang it and asked him if
he meant that bell; he answered, "No, the bell in the hall-
way." Dr. James died at about half-past 11 and his body
remained in the position described until 1 o'clock. A doctor
came in and promised to send an undertaker. Somebody
passed the remark that the undertaker was very slow in com-
ing and Mrs. Milen thereupon said, "We can't do anything—
we are only strangers in the house," but afterward she sent
Lulu to call another undertaker and he came after the one the
doctor had sent. The undertaker that came first laid the
corpse out in the front room and he sent all of the ladies into
the bedroom. He removed the purses and what personal ef-
fects the deceased had in his pockets. There were three or
four purses; there was a diamond ring, a pocket-knife, and a
few small articles. The undertaker passed those articles to
Miss Maria Mangan and she tied them up in a handkerchief
and gave them to Miss Coon to hold while Maria locked up the

desk. Miss Coon kept them for the night and returned them to Maria the next morning when she was going to work. While the ladies were in the bedroom Mrs. Milen sent Lulu to send a telegram to Dr. Milen that Dr. James was dead. Lulu went and returned and said that she had written, "Papa, Dr. James is dead. Come." Mrs. Milen wanted to know why she said "Come," since he would know best what to do—*maybe he would want them to come down there.* Lulu said that the telegram would not go until 8 o'clock next morning and she went back that night and changed the telegram to, "Papa, Dr. James is dead." When Lulu came back Miss Coon heard her tell what she had done. On that night the ladies talked a good deal about Dr. James; Laura said nothing about him; her sister, Mrs. Lulu Dickman, was talking about what a dear friend the doctor was to them and how much he thought of Jessie and Laura. There was no shedding tears. Miss Coon was not present at the funeral nor when the body was removed from the house to the hearse; she was at her work; she left the house on the 26th of February, 1895; she never saw Dr. James and Laura together.

Miss Maria Mangan, at the time of the trial and of taking her deposition Mrs. Davis, having become a married woman since the death of Dr. James, lived in his house, 925 Howard street, on the 28th of January, 1895, and had been his housekeeper for two years and three months prior to his death, and had been intimately acquainted with him. On the date specified there were living in that house Mr. and Mrs. Biro, Mr. O'Neill, Mr. Ott, Mamie Dalton, Katie Dalton, Vica Coon, the Milen family and Mr. Dickman. The Milens came about the 13th or 14th of December, 1894. The members of the Milen family were Dr. and Mrs. Milen, Miss Laura Milen, and Mrs. Lulu Dickman. Miss Maria Mangan conversed with Dr. James every day about business and family matters; he spoke of the Milen family to her on several occasions; he spoke to her the Sunday before he died; he said that Laura Milen had gone up to Market street and he had invited them to dinner, and he told Maria to wait and put the dinner in the oven until Laura returned. Maria had prepared the dinner and he told her to wait until Laura's return. Dr. James did not tell Maria if anyone but Laura was to be his guest on that occasion. She

did not know of his ever having made presents to any of the Milen family. She heard him speak of Laura on several occasions; he said he was treating her for catarrh. Dr. James was a close man; Maria thought him a close man because he sold some of his deceased wife's clothes to a Mrs. Bissen and he wanted to sell Maria herself some of those clothes. He spoke of Miss Laura Milen as "Laura"—"just Laura." Maria Mangan never knew of Laura and Dr. James occupying the same room together. Maria took care of the rooms and was housekeeper and cook—general utility. She never heard Dr. James introduce Laura to anybody. The Milens occupied a front room on the first floor. Dr. James occupied all the lower floor but this room. He dined in the dining-room; that was between the kitchen and the bedroom on the first floor. On that floor were the kitchen, the dining-room, his bedroom, office, parlor and the room occupied by the Milens. His office was the back parlor. He usually dined alone. Maria cooked for him all the time for two years and three months until he died. Maria Mangan knew Dr. Terry. She saw him come to Dr. James' house sometime before the latter's death. She saw Dr. Terry also after that event. Dr. Terry said that Laura Milen was Mrs. James and of course Maria would be a witness in the case and Laura would see to her yet. Dr. Terry said to Maria, "She will see that you will be all right." Dr. James died in his office on the 28th of January, 1895. He had been sick since the morning before he died. He was attended in his last sickness by Maria and Judge Hudson. When Dr. James died there were present Mrs. Milen, Laura Milen and Maria Mangan. In the morning of that day, at about 7 o'clock, Maria came downstairs to prepare breakfast and she knocked at his door and Dr. James opened it. Dr. James had a blanket around him and Maria asked him what was the matter, and he told her that he was sick since 3 or 4 o'clock in the morning; he had been taken ill in the nighttime; no one was with him; he was all alone. He told Maria that when he was taken sick he went out himself and got a bucket of coal and made a fire in his office. Dr. James was quite sick; he walked around the floor all day; he ate some toast, and in his office about 5 o'clock he ate some rice and milk. Maria was with him occasionally and Judge Hudson

was with him two or three times. He died between 11 and 12 o'clock that night. Maria sat up with the corpse that night. Mrs. Milen, Miss Laura Milen, Miss Mamie Dalton, and Miss Vica Coon sat up until 3 o'clock in the morning; Mrs. Dickman was there also. Maria never noticed what condition or frame of mind Laura Milen seemed to be in while sitting up with the dead. There was no lamentation from anyone. Nothing was said that night about the relations between Laura and James, but the next day Maria heard Mrs. Dickman say in presence of Laura that the latter was engaged to Dr. James and that it was too bad he died as he would soon have been married to Laura. On the morning before Dr. James was buried Mrs. Milen said in the presence of Laura that Laura was engaged to Dr. James and that she was wearing her engagement ring; this remark was made in Mrs. Milen's bedroom. Maria Mangan never heard Laura say aught about her relations with Dr. James. After the death of Dr. James the public administrator took possession of the place the next morning and opened the desk of the deceased. He looked over the private papers and took away a bankbook and some jewelry that was there. The corpse remained in the house from Monday night until Thursday. Dr. James' body was laid out in the front parlor. People were in and out all the time. Two men came from the undertaker's and remained with the corpse two nights. Dr. James kept his letters and private papers in his desk in his office or back parlor. While the body was laid out the intervening doors were open; anyone could pass in and out. After the funeral Maria Mangan took possession of the house at the instance of the administrator. The connecting doors and other doors were then locked and the keys given to her. There was a piano in the front parlor; it belonged to the Milens. Sometime after the death of Dr. James—how long Maria could not remember—Mrs. Milen entered the parlors. She had a trunk in there and asked Maria for the keys; this was before the twenty-fifth day of March, 1895; it was before Mr. Shadburne went there with General Hart to examine the papers. Maria Mangan made up the beds every morning for Dr. James, and during the last two months of his life did not know of anyone sleeping with him. He always took his dinners at home. He never dined out but once; he ate alone

every morning. Maria never cooked any breakfast that Dr. James and Laura ate together, and Maria cooked every breakfast during the two years and three months she was with him. If anybody in that household was in a position to know the facts of the occurrences therein, it should seem that person was this faithful servant, Maria, who made the beds, prepared the meals, cleaned the rooms, built the fires, and performed all the domestic drudgery of the establishment, and was also the recipient of his confidences as to business and family affairs. She was his housekeeper and maid of all work, and intimately acquainted with him; conversed with him every day; had control of his ménage and never heard of this marriage.

The local life history of the deceased is perhaps best epitomized from the testimony of George Hudson, a somewhat venerable attorney at law, who once occupied a judicial position in the early times of San Francisco, and has been since, accustomed as the citizens and natives are to such honorary titles, commonly called "Judge" Hudson. This gentlemen so titularly distinguished had the longest continuous acquaintance with the deceased of anyone who appeared as a witness in this contest. We have already referred to his testimony as to what occurred before his eyes at the time of the funeral and immediately preceding, and we shall now revert to his narrative to make the connection complete; Judge Hudson first made the acquaintance of Charles A. James in 1854; Hudson was then about thirty years of age and James a youth of about nineteen years and a clerk at the Crescent City Hotel on Sansome street, and continued in that capacity at the Tremont and International. Afterward James went into the real estate business for several years. Hudson has lived at 226 Fifth street, corner of Clementina, for quarter of a century; he and James were intimate. Hudson knew the first wife of James; she died in 1891. He conversed with James often about his condition in life; they exchanged confidences. After an interview he had with Dr. James in the latter part of December, 1894, Hudson used to see him very frequently. James visited Hudson up to the 20th of January, 1895, almost daily. The next time when he talked with him about his condition in life and the subject of marriage was a week before Dr. James died, on Monday or Tuesday, January 20 or 21, 1895. Hudson had

occasion to call to see James at his house, 925 Howard street, as he wanted to call upon Dr. Nusbaum, a physician, who had attended Hudson in his illness, to try to settle a disputed bill. It appears that Dr. Nusbaum had presented Hudson with a large bill for medical attendance and Hudson wanted James to negotiate a settlement; hence the visit of Hudson to Dr. James to act as an amicable intermediary. Hudson found Dr. James in his rear parlor as usual. Hudson had been there but a few minutes when he heard some one playing a piano in the front room and he asked who was playing. James told him that it was a Miss Laura Milen; the intervening doors were closed. Hudson said to James, "Why, I know a Miss Laura Milen!" James said, "Do you?" Hudson answered, "Yes, I have known her for some time; if you will speak to her, I should like to see her." He had no objections, and, opening the folding doors, brought Miss Milen out and said, "Judge, this is Miss Laura Milen." Hudson said, "Yes, I know Miss Laura Milen very well." *This was on the Monday or Tuesday before Dr. James died;* that would be the 21st or 22d of January, 1895. Hudson shook hands with Laura and asked her about her family and had a few moments' conversation with her. When she retired from the room Dr. James told Hudson that the Milen family consisted of Dr. Milen and Mrs Milen and two daughters; that they came to his house and en. gaged rooms about the 13th or 14th of December, 1894; that Dr. Milen was an itinerant physician, traveling about the country; that Lulu was married to a man named Dickman, who was worthless. Dr. James said that he had rented the Dickmans rooms on the third floor at six dollars a month, and that he had rented the hall bedroom to Dr. Milen, and Mrs. Milen and Laura occupied it when Dr. Milen was absent; it was rented at $10 per month. Dr. James feared they would not pay him his rent; he said they were very poor; he said they were strangers to him and had been there a month at that time. Hudson had met the whole Milen family the first year that they were living in San Francisco on Ellis street— 321. By reason of an advertisement Hudson was attracted to Dr. Milen. Milen advertised that he could cure the opium and liquor habit. Hudson had a lady friend whom he wanted cured and arranged with Milen to treat her. During that

time Hudson met Mrs. Milen and had a conversation about a book she was then writing entitled, "Was He to Blame?" Mrs. Milen told Hudson that she was writing this book and she wanted his lady friend to assist in copying the manuscript, as his friend wrote a better hand than Miss Laura Milen did. Hudson had his friend so engaged for two days and nights while she was absent from his home where she was staying; this lady friend was sojourning at Hudson's home. After the Monday or Tuesday preceding Dr. James' death, when Miss Laura Milen was presented to him as related, Hudson next saw James the same week, either on Thursday or Friday night. James came to Hudson's house in the evening and informed him that he had seen Dr. Nusbaum, but no definite arrangement had been made; that he was to see him again the next day. Hudson went to James' house the next day or on Saturday but did not see him. Hudson saw Miss Mangan but Dr. James was not at home. Hudson next saw Dr. James on the following Monday morning, January 28, 1895, the day he died. Hudson found Dr. James in his rear parlor sitting in his large armchair in his shirt sleeves or with a white night shirt or white coat, with a buggy robe thrown around him, around his shoulders, sitting near the grate on the right-hand side as one entered from the front. Dr. James was very ill; it was about 8 o'clock in the morning. Dr. James then told Hudson that on that morning, at about 4 o'clock, he was seized with a violent chill; that he was obliged to get up alone and make a fire in the grate to heat water to treat himself with; that he had been very ill but at the time he was talking he felt somewhat better sitting in his chair. Dr. James was very much troubled to talk or to breathe. Hudson reproved Dr. James for being alone and having no one to attend to him. Dr. James said to Hudson, "I don't believe there is a doctor in San Francisco that is as sick as I, who would not have sent for a physician," to which Hudson assented, but Dr. James said, "I am going to rely upon my medicine." Hudson told him that he must certainly get some one to look after him. The coalscuttle was empty; the embers were dying in the grate; only the smoldering remains of a fire were there; not out entirely but needed replenishing—altogether a cheerless scene on that winter's morning. No nurse about, no woman in sight,

nor anyone to attend to the wants of this sick and solitary old man. At that moment when most needed there was certainly a lack of woman's nursing and a dearth of woman's angelic ministrations. Then and there was the time and the place for the young wife to appear and to aid in appeasing the anguish and pain of her spouse; but, if Hudson is to be believed, there was no such appeaser about. Dr. James said to Hudson that his servant, Maria Mangan, would be in the room from time to time and he did not think he really needed anybody to be there to wait upon him all the time. Hudson remained for an hour or more. James told him that he had not concluded any positive arrangement with Dr. Nusbaum and had not seen him since. During the hour Hudson was with James no one came into the room. There was a sofa or lounge on the east side of the room; north of the door that entered the room from the hall, James had his armchair that he was sitting in; there were one or two chairs in the room. Dr. James' secretary desk was on the left of the mantel near the window. Dr. James begged Hudson to come around and see him again in the evening. Maria Mangan let Hudson into the house on that morning. Dr. James told Hudson that Maria was his only servant. In the evening Hudson went back to see Dr. James about half-past 7 and James was sitting in the same place in the same chair, with his robe thrown around him, without any coat on him and he was breathing very hard and was very ill. Hudson was there but a short time before Mrs. Jessie Milen came into that room from the hall, passed through the room; as she was passing she said, ''Miss Laura and I have had tickets presented to us for the theater and we are going to the theater.'' She said never another word, but opened the folding doors and went into her own room; this was about quarter to 8 o'clock. Dr. James then remarked to Hudson, ''They are going to the theater and will be home about 11 o'clock,'' and presently was heard the sound of two persons going out of their room and downstairs. Dr. James then said, ''They have gone to the theater.'' Hudson found Dr. James very ill and said to him, ''Don't you try to talk; I will talk to you''—trying to amuse him. Dr. James said to Hudson during that interview, ''Judge, if anything should happen to me would my stepdaughter have anything to do with my estate?'' Hudson

replied, "No, Dr. James, you have had two settlements with that woman and nobody will have anything to do with that estate but the executors of your will." Hudson was not his attorney and never had been. At this time nobody but the two men were present in the room, nor had there been during the hour except Mrs. Jessie Milen, who passed through prior to her going to the theater as stated. At the interview early in the week before he died nothing was said about marriage directly, but after Laura left the room Hudson remarked to Dr. James, "These young women are sometimes dangerous," to which James answered that he had been proof against that for a long while. When Hudson was leaving Dr. James on the night of the 28th of January, 1895, he talked with him about being alone and told him that he thought it was very imprudent; that there should be somebody with him. Dr. James replied, "I am not going to sleep to-night; I shall not lie down; I can't lie down. I shall sit in this chair all night." Hudson said to him, "I will get somebody to stay with you; you have no coal in your scuttle again and your fire is low." James responded, "Maria will come into my room at 10 o'clock, before she goes to bed, and will see to me." Hudson left at about 9 o'clock and never saw James again. The next morning he heard of Dr. James' death and went around to 925 Howard street quite early. He had not heard of the death until he went to the house at about 8 o'clock, and was horrified to see crape on the door. Hudson rushed upstairs and found Miss Maria Mangan, the clerk for the public administrator, a Mr. Cluen, and several other persons, at the secretary in Dr. James' office or back parlor. They told him that Dr. James had died at 11 o'clock in the night before. The public administrator's clerk was there receiving the personal effects of the deceased. Miss Maria Mangan was handing the effects to the clerk and he was taking account of what was found upon his person or in the secretary or desk of Dr. James. There were present Maria Mangan, Cluen, the clerk, and Hudson, and some women in the house. Laura Milen, Mrs. Milen, Mrs. Dickman, and Mr. Dickman were not there, no one nor any of them was there. The effects found were some thirty or forty dollars in money, bank bills and gold, some purses, a diamond ring, and some other articles found upon his person.

Maria Mangan delivered these in the presence of Hudson to Cluen, who was acting for the administrator. Hudson had a conversation on that morning with Mrs. Jessie Milen in her room, the hall bedroom; Laura was present. They said it was too bad poor Dr. James had died so suddenly. Mrs. Milen said to Hudson at that time and place, and in presence of Laura, that Dr. James had proposed marriage to Laura; the latter said nothing. After the funeral on Thursday Hudson saw Mrs. Jessie Milen at his own residence 226 Fifth street, on Saturday afternoon. Mrs. Milen called upon Hudson and told him that the diamond which was found upon the person of the deceased had been given to her by him a short time before he died. She told Hudson that she had been admiring the ring very much and remarked how happy she would be if she had such a ring, and he said, ''If this will make you happy, I don't care for the ring, I will give it to you,'' and then he took it off of his finger and gave it to her. She wore the ring for a short time, but on the Saturday before he died, when he took her and Laura to the matinee, Mrs. Milen said that she could not wear her glove with that ring on and she took it off and gave it to him, and he put it in his pocket and never returned it. Mrs. Milen wanted to know from Hudson how she could obtain that ring from the administrator. He gave her some advice as to the mode of proving the fact of the present. Hudson saw Mrs. Milen again two or three days after that Saturday. He called at the James residence to see Maria Mangan to find out what was going on. He went into Mrs. Milen's room and inquired of her if she had found anybody to sustain her story about the ring. She then told him that a doctor and his wife had called to see the deceased just before he died and James had told them that he presented this ring to Mrs. Milen. Laura was present when Mrs. Milen made this statement, and at the same time Mrs. Milen told Hudson that Laura was engaged to be married to Dr. James before he died; she said they were engaged. Hudson frequently thereafter called at that house. On or about the 12th or 13th of February, 1895, at the same place he had an interview with Mrs. Milen, and she said that the administrator was going to allow them to remain in their rooms and that Laura was married to Dr. James before he died. That was the first intelligence Hud-

son had received of that interesting fact; up to that communication as made by Mrs. Milen he had no information or intimation of anything of the kind.

Mrs. Mary Gallagher, formerly Mamie Dalton, roomed in Dr. James' house, 925 Howard street, at the date of his death and for some time previous to that event. She was not in the room at the moment he expired but shortly after. Mamie Dalton, Vica Coon and Maria Mangan were upstairs in their beds when the bell rang, and in response they all came down together and found the doctor dead, and Mrs. Milen, Laura and Mrs. Dickman were there in the room. Mrs. Milen said that she and Laura had just returned from the theater and asked the doctor if there was anything he wanted and he said, "No," that if he wanted anything he had told Maria he would ring the bell, and with that Laura took a small bell from the mantel and rang and the three girls came down. Mrs. Milen told the undertaker that they were perfect strangers and that the doctor had no relatives here. Mrs. Dickman told Mamie Dalton, this witness, that it was too bad the doctor had died as he was engaged to her sister; Laura was not present at this remark.

Mrs. Annie Carter saw Dr. James three days before he died; she called at his house to see her sister, Mamie Dalton. Dr. James opened the door and as she entered she heard a piano playing in the parlor and said, "Doctor, I thought you had sold your piano." He said that he had but that it was Laura Milen who was playing; that as Laura had not space enough in her room for the piano he allowed her to move it into the parlor. Mrs. Carter was formerly a roomer in the James house but left on October 9, 1894, and was married from there October 10, 1894. Mrs. Carter had seen Laura Milen on a previous occasion to that testified to as to the incident of the piano playing. About nine days before the doctor died she had seen Laura passing through the hall in a low-necked dress and she remarked that the girl was finely dressed for a person who occupied but one room; he said, "Yes, and could not pay their rent at that."

Among those present at the time of the funeral of Dr. James was Newell Winants, an old friend, who had been acquainted with him since about 1865, when James was clerk for F. E. Weygant, proprietor of the Tremont House, on Jackson

street east of Montgomery; from 1889 Winants was very inti-
mate with James.   For a time James had a real estate office on
the northeast corner of Montgomery and California streets.   In
1889 he had a catarrh medicine, and manufacturing and vend-
ing that article and trading in real estate was about all his
occupation.   Dr. James and Winants were very intimate from
that year until the end of the doctor's life.   Dr. James was at
the house of Winants on the second or third Sunday before
his death at 2 or 3 o'clock in the afternoon.   Winants and
James had a general conversation for an hour or two on that
occasion in which he put the question to James, ''Why don't
you get married?''   James answered that he would not marry
the best woman in the world, that he had no use for a wife,
that his time was taken up with the study of medicine, and
that he had passed the period of procreation for a long time.
Winants asked Dr. James if he had his house full, and he said
he had rented some rooms to a family about whom he did not
know much.   James did not mention their names.   Winants
was present at the funeral and saw there Maria Mangan and
Judge Hudson and a lady in the back room with two children
and two other ladies.   Winants asked Maria who these two
ladies were, and she said they were the people upstairs, and
that the woman with the two children was not a tenant but was
a friend of the deceased doctor.   If Winants tells the truth,
Dr. James was a dissimulator without apparent motive; there
was no appreciable reason for lying.

Why James should have been so effusively communicative
to the Terrys about his marriage and prospective paternity and
about the same time conceal from old and confidential friends
of more than thirty years' acquaintance these facts, and go
further and give as a reason why he did not marry his im-
potency, is a proposition that is sought to be answered by the
result of a solution of sophistry that attempts on the one hand
to prove this marriage by circumstances of publicity, such as
street introductions and the like, and on the other. hand en-
deavors to destroy the effect of the doctor's denial by claiming
that the ''time, disposition, and circumstances of this case did
not permit, nor was it necessary for Charles A. James to pro-
claim his marriage from the housetops, at the corners of the
streets, or in the newspapers; the laws did not require it nor

did the good of society demand it.'' This is an extract from
the very able argument of Mr. George W. Fox, whose adroit
presentation of his case may be alluded to without invidious
comparison to his associates, to whose views we have given ade-
quate attention in the course of this opinion.   Mr. Fox, in the
passage quoted, says it was not necessary for the decedent to
proclaim his marriage ''at the corners of the streets,'' and yet
he sturdily and strenuously insists on, as proof of a public
proclamation, an introduction by Charles A. James of claimant
as his wife to George Williams and John Bigley near the
''corner of the street,'' on Howard street, near Fifth, in Jan-
uary, 1895! Public introduction and recognition! Miss Mary
Vinnott was a dressmaker at 440 Clementina street, where she
lived; she did some work in her line for Mrs. Milen; she had
known Miss Milen and Mrs. Dickman since New Year's Day,
1895, and Mrs. Milen since a week after that day.   Miss Vin-
nott was in the house at 925 Howard street on the night that
Dr. James died; as to how she came to be there she relates that
she was in the drugstore when Mr. Dickman came in and an-
nounced the fact and she went up there.   Mrs. Milen and Miss
Milen were there.   Laura said, with a smile, that she would
never forget the face that the doctor made as he died.   Mrs.
Milen said as she got up and walked toward the closet, ''Laura,
it would have been all right if you had married him; you would
have all the property.''   Mrs. Milen told Miss Vinnott once
that Laura might have married Dr. James but she preferred a
strolling actor.   On the night of the death of Dr. James, when
Miss Vinnott was there, there were four ladies present—Miss
Maria Mangan, Mrs. Dickman, Miss Laura Milen, and Mrs.
Milen.   Miss Vinnott sat on a lounge near the fireplace.   When
Mrs. Milen made the remark Laura was present; it was in the
back parlor after the undertaker had gone away; it was about
2 o'clock in the morning.   Miss Vinnott remained until 5
o'clock in the morning.   Laura once said to Miss Vinnott at
her house, while Mrs. Milen was present, that she could marry
Dr. James but she did not care to as she only wanted the
things.   She had made a wine-colored dress for Laura and a
couple of wrappers for Mrs. Milen.   At the time of these con-
versations at her place Miss Vinnott was making a black silk
dress for Mrs. Milen.   There was in Miss Vinnott's establish-

ment at this time a young lady operative, Miss Ella Sullivan. The rooms of Miss Vinnott were then at 931 Howard street, near the James house. Miss Sullivan was there engaged in her occupation about a week before Dr. James died and a conversation occurred in which the participants were Mrs. Milen, Laura Milen, Miss Vinnott, and Miss Sullivan; the latter two ladies were then engaged in making over a wine-colored dress for Laura Milen. While the four were talking, looking out of the window, Dr. James was observed passing by, and Mrs. Milen remarked, "There goes Dr. James. Laura might easily marry him, but she prefers a strolling actor. I would 'pull his leg,' but Laura will not work with me." The expression "pulling his leg," Miss Sullivan explained as meaning to coax or wheedle his wealth out of him. About three days before the death of Dr. James—which would be about the 24th or 25th of January, 1895, on a Thursday or Friday—Miss Sullivan went to Mrs. Milen's room to hook on a dress, at about half-past 5 o'clock, as she was going to dinner with Dr. James. While Miss Sullivan was engaged in the hooking Laura came in and Mrs. Milen said to her, "Let us blow the old man in for theater tickets and a supper," and Laura said she would try. It is proper, in this connection, to observe that Mrs. Milen denies the accuracy of this detail and testifies in rebuttal that she received the black silk dress which Miss Vinnott made on January 5, 1895, and that Miss Sullivan fitted or buttoned that dress upon her about 5 o'clock on that day. Mrs. Milen was positive that it was that day, because Dr. James and Laura went to the matinee on that day, and Mrs. Milen did not go because Laura had her new dress finished and as Mrs. Milen did not have her dress ready she would not go. Claimant's counsel think that Miss Sullivan must have mistaken Mrs. Dickman for Laura.

John O'Neill was a roomer in the house of Dr. James. He was very familiar with the deceased and they conversed frequently in the evenings, sometimes from 7 to 10 o'clock in the evening. Two weeks before James died O'Neill had a conversation with him and remarked that he must be lonely since he had lost his wife, whom O'Neill had known. Dr. James replied that he was going to sell out there and move down town into a private hotel. O'Neill was in the house when Dr

James' wife died and he was there when the doctor himself died. He was there when the body was laid out by the undertaker. O'Neill was aroused by Maria Mangan at about 9 o'clock in the morning and told that Dr. James was dead. O'Neill arose and after attiring himself descended the stairs to the rooms of Dr. James, and there observed the undertaker proceeding to prepare the body for sepulture and heard him direct the ladies to retire into the rear apartment, whither they went accompanied by O'Neill, although the undertaker requested him to remain, but he declined to accede to this request. One of the ladies was Mrs. Milen, he could not remember whether Laura was one, Maria Mangan and Miss Coon were two of them, and perhaps one or two others. He did not hear anyone say, "Oh, my poor husband!" O'Neill never heard that the young lady claimant here was married until after the death of Dr. James, when Maria told him that Laura claimed to be his widow. There had been a piano in the rear parlor during the lifetime of Mrs. Susan K. James but after her death it was removed into the front room. O'Neill did not know whether it was the same piano. The date of the death of Dr. James was the 28th of January, 1895. O'Neill is a painter by trade—industrious, intelligent, uninterested.

Alphonse Astorg, a butcher at 108 Fifth street knew the deceased for about fifteen years before his death. Dr. James was a customer and used frequently to talk with Astorg, when the butcher was not busy, for fifteen or twenty minutes at a time. Astorg used to sell his medicine by the bottle; he never visited the house of Dr. James. Astorg was not dealing in mineral waters at that time. Astorg had a talk with Dr. James on the Saturday prior to his death, which would have been January 26, 1895, at about 9 or 10 o'clock in the evening. Astorg asked James why he did not get married. James said, "No marriage for me." Dr. James said that he was sick, had kidney disease, bladder trouble, dropsy. Dr. James had come into the shop of the butcher to buy meat and Astorg joked with him because he had seen him walking with a lady that afternoon, and remarked to Dr. James that he was quite a young man, and the doctor said that he had been at the matinee with the lady.

Mrs. Sarah Jane Williams knew the deceased since 1870; saw him very often in the latter years of his life. Dr. James used to call at Judge Hudson's house, where she was sojourning, and she used to open the door for him and let him in. She conversed with him frequently and freely. The last time he called she alluded to his long absence and she said to him. "The judge and I have been talking about you; we did not know whether you were sick or off getting married as young boys of your age are apt to do." Dr. James answered that he was not sick and had not been getting married, as he had had enough of that. The next time she saw him he was dead. She was at the house and heard no exclamation of mourning there at time of funeral or at the grave. Dr. James had told Mrs. Williams that he had dropsy, bladder trouble, and Bright's disease.

That Dr. James was and had been for some time in poor physical condition is clear from this testimony, if it be truthful. He had several ailments—dropsy, asthma, catarrh, bladder affection, kidney trouble, Bright's disease; many maladies conspiring to the collapse that occurred. He told Dr. A. Nusbaum on Thursday of the week before he died that he had anasarca, which is defined as a dropsical affection of the cellular tissue, and Bright's disease, an organic affection of the kidneys which does its work of destruction by inducing other diseases, and the effect of this disease is impotency in such a case as that of Dr. James, according to Dr. Nusbaum.

Patrick Lawlor, a grocer on the same block, saw Dr. James at 8 o'clock on the morning of the day of his death. Lawlor was accustomed to buy medicine of Dr. James, and on that day, at the hour indicated, he went to the doctor's office apartment and found him sitting in front of the fireplace alone; no one was with him. Dr. James said that he was deathly sick; he had been sick all night. He thought he had eaten too much on the night before. The last previous occasion on which Lawlor conversed with Dr. James was the Thursday prior, when he told him he had a young lady under treatment. Joseph McGrath kept a store for groceries and varieties at 921½ Howard street at and before the time of the death of Dr. James, and he was acquainted with the

members of the Milen family. They were all customers; he did not visit them in a social way, but he called at the house on business account. He knew Dr. James for about six months before he died; he was acquainted with him in the same manner as with the Milens. Mr. McGrath knew Dr. James longer than he did the Milens. James died about the 28th of January, 1895. His death was sudden. In talking to Mr. McGrath the day after the funeral concerning the accounts of Mrs. Dickman and Miss Laura Milen, Mrs. Milen advised him to be careful about these two accounts, not to get them mixed up. Mrs. Milen told McGrath that she had two daughters; that one was single and one was married—Miss Laura Milen and Mrs. Dickman—and that the latter's husband would have to be liable for his wife's account and that she, Mrs. Milen, would be answerable for Laura's account. On several different occasions for two weeks thereafter Mrs. Milen told Mr. McGrath at his store that Laura had been engaged to James, and that it was too bad that he did not live a while longer and she would have got his estate. After the funeral, when Laura came to the store of McGrath, she also mentioned that she was engaged to Dr. James. Mrs. Dickman several times said the same to him. Edward F. Cluen testified that in his capacity as clerk for the public administrator he went to the house of deceased immediately upon hearing of the event, and sealed the desk and put the official seal over the keyhole. Mr. Cluen examined the desk thoroughly, looking for a will. He did not remember seeing any loose sheets of writing paper nor the envelope marked in print "P. M. James." After examining the contents of the desk he shut it up and put his official seal thereon. Subsequently, on a second visit, in the presence of General Hart, Mr. Shadburne, Mrs. Milen, and the petitioner Laura, the desk was opened and the document here in question discovered. General Hart searched the desk on the second visit and found the envelope marked "P. M. James," and took out of it the contract. Evidently the superficial search was superior to the thorough examination.

William J. Herrin, an attorney at law and until lately a partner in the firm of Shadburne & Herrin, visited the house, 925 Howard street, on the second day of February,

1895, at the request of Mr. Shadburne, to ascertain if deceased left a will and also to secure information as to the existence and whereabouts of heirs. Mr. Herrin went with Cluen, the clerk for the administrator. He examined all the letters in the desk and found no will there or in the bureau or chiffonier. Mr. Herrin found some letters from P. M. James and Mattie. He found no paper purporting to be a marriage contract; but afterward, when General Hart examined the same desk, he had no difficulty in discovering the identical document in an envelope marked "P. M. James"; although Mr. Herrin swears that he examined all the letters in that receptacle. It is a common experience in life that the ability to find anything depends upon the knowledge of what one is looking for, and so it is illustrated in this item of comparative evidence; General Hart knew what he wanted and where it ought to be deposited and found it right there, while Mr. Herrin had upon his visit been prospecting for a will in utter ignorance of the claim of a marriage contract, of which there were at that time—February 2, 1895—no outcroppings. It was a hidden treasure, but "man's industry searcheth out many things," and it is recorded in the Book of Job, with which counsel are familiar, that "there is a vein for the silver; and a place for the gold where they fine it," and so the industry of man and his power of penetration may find a vein of marriage contracts undiscernible to others.

On February 21, 1895, when the petition of the public administrator for letters of general administration was heard and granted, the claimant here was present in court but made no application for letters on her own behalf and made no opposition to the claim of the public officer. She was sworn and examined as a witness on that occasion, and testified that the contract was drawn up and both signed it in the presence of each other, and then Dr. James took the document and placed it in his desk; that transaction took place on the 6th of January, 1895, and subsequently she had not seen the paper. This was the story she told in this court on the 21st of February, 1895, but on the 9th of March, 1897, although she says she cannot recall exactly what she testified on the first date, she distinctly denies that she made the sworn statement imputed to her; and yet again, after further examination, upon

the last date, March 9, 1897, in answer to cross-question, she qualifies her distinct and downright denial by saying that when she was asked if she remembered and answered as she had done to her own counsel she meant that she could not recall exactly but that she does know at the present time what she knew on the 21st of February, 1895, to this extent. What was done with the contract she does not know, but after the paper was signed Dr. James took it up and put it in his pocket and said he would wear it next to his heart, and when Mrs. Milen came home he showed it to her. The contract was not put there in the drawers of his desk until after Mrs. Milen had come home; she will not say positively that he put it back in his pocket. With this qualification made upon her final cross-examination claimant said the statement of February 21, 1895, was correct.

In view of this testimony it may well be asked, When and how came into the desk of the deceased this document? The claimant swore with the utmost particularity and precision on the 10th of December, 1896, in the trial of this cause, that on the sixth day of January, 1895, after the paper-writing was completed and signed, James said to her that she was now his wife, and "then he took the paper and tore it off the tablet and put it in his pocket, and said that he was going to carry that next to his heart; he placed it in his pocket on the left-hand side," she did not remember whether it was his vest or coat pocket, but "he must have put it in his vest pocket." This is straight, direct, positive and absolutely at variance with the testimony given by her on February 21, 1895, when she swore that when the contract was drawn up and signed, "then Dr. James took the document and placed it in his desk." When this contrariety of statement is brought home to her and established on the ninth day of March, 1897, she makes a lame and impotent attempt to reconcile the conflicting elements of her evidence. Plainly, there is a screw loose somewhere. On the 21st of February, 1895, about forty-five days after the making of this alleged contract, when the facts must have been fresh in her memory, she solemnly swears that the deceased spouse placed this precious paper in his desk. She had known nothing of such contracts before, neither had her father nor her stepmother. Such an anomalous sort of

ceremony was repugnant to the old-fashioned Methodistical ideas which came down from her ancestors, who would have rigidly insisted upon a parson and a certificate, and have taken care that the certificate was placed where it would be preserved for the protection of the honor and rights of the wife in the event of any question such as has arisen in this case. But bating any allusion to the facility with which this young woman agreed to this manner of marriage, it is more than passing strange that she should have so easily yielded up this sole muniment of her title to the sacred name of wife. It has been finely said that in the conduct of life, ''we cannot spare the coarsest muniment of virtue,'' but we have a document here that constitutes the very highest and most valuable possession that a woman can hold to prove that she is a virtuous wife and her child pure progeny, and yet, instead of retaining it to protect herself and the possible issue of the marriage, she surrenders it to him, who may, if he choose, destroy it, or whose heirs may come and, through its loss or disproof, cancel her claims to honest wifehood and righteous maternity. ''It is to be presumed that such contracts are made for the woman's protection; but here the order seems to have been reversed and the man procured the evidence of marriage and securely locked it in his desk for his own protection.'' If she told the truth on February 21, 1895, this is what Dr. James did; but if we are to believe her now, he placed it in his vest pocket, left-hand side, where he was going to carry it next to his heart, and with this safe deposit she seems to have been content.

Counsel for claimant argue that the marriage by contract and consummation and circumstances having been established, the child is presumed to be legitimate, the husband's potency having been demonstrated; ''but if for any reason this court should hold that the alleged marriage contract is invalid or not proved, nevertheless the child is entitled to inherit under the code'': Civ. Code, sec. 1387; Graham v. Bennett, 2 Cal. 503.

The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate: Code Civ. Proc., sec. 1962, subd. 5. Counsel claim that the infant Theodore is the son of Charles A. James, born in lawful

wedlock; but if the court find the marriage contract null and void, then the infant is entitled to inherit the whole of the estate under the provision of the Civil Code, which declares that "the issue of all marriages null and void at law are legitimate." Clearly, the counsel deserve commendation for their cleverness, for they have provided two strings for their bow. If marriage be not proved, and they ingenuously cast the burden of disproof upon the respondent, at all events they have shown that the claimant gave birth to a child who, like the early rose in the poem, "antedated its mission in an unprepared season"; and, by presumption of law and medical opinions and direct evidence, they make of this unseasoned babe the spine and marrow, the very pith and sinew, of their case.

It is claimed that Dr. James was the father of this child, because claimant testifies that he was its carnal cause and her testimony is truthful; but if the infant was not delivered in normal time, if the birth occurred in advance of the usual period of gestation, which is nine months or from two hundred and seventy-five to two hundred and eighty days, then if James was the father, the conception having been on the 6th of January and the birth on the 16th of September, 1895, the babe was brought forth prematurely, in eight months and a third instead of nine calendar months, according to the highest authorities, the proper term; and to support this theory Dr. Walton Preston testified that he attended the lady and delivered her, with instruments, of a seven pounds child, and that he noticed that the infant had undeveloped finger and toe nails, abbreviated and attenuated nails, which indicated that the complete limit had not elapsed. This item of the shortened nails signified that the babe had been sent "unfinished before its time into this breathing world." In no other respect was it curtailed of nature's fair proportions; the child was as healthy as the average child, and the trained nurse, Miss Mary Adelaide Waterman, a very intelligent woman, one who observes facts and reports them to the attending physician, saw nothing beyond these slightly undeveloped nails to indicate a premature birth. Miss Waterman said, "The nails indicated a slightly premature birth"; it was her duty as nurse and she did observe such details and call them

to the doctor's notice. The babe was born at 10:45 o'clock in the morning of the 16th of September, 1895, and weighed seven and three-quarter pounds; the child still lives.

The child still lives, and upon this question of the vitality and continued health of this infant, as affecting the proposition of its being born in full time, we have some medical testimony. Dr. Preston says that the idea that an eight months' child is less likely to live than one born in seven months is exploded. Dr. Frederick Walter Harris says that the consequence of conception immediately after menstruation is premature birth. A seven months' child has no advantage over an eight months. When we find a fact we generally look for a cause, and medical men when they can find no other assignable cause would accept the lack of development of nails as a sign of premature birth. Doctor Harris has known eight months' children who lived. The usual period of gestation is forty weeks; the ordinary period is two hundred and seventy days, according to this doctor's experience of twenty years, in which he has had four instances of actual observation of gestation and has devoted much time to the study of the theory. In the case put to him Dr. Harris said the child would be a weakling from the beginning. Dr. John Leffler, "a physician of the old and only school," allopathy, performed an operation on the claimant on May 24, 1896, at 925 Howard street, in presence of Dr. Preston, Dr. Cox, and another doctor. Dr. Leffler was called in by Dr. Preston to assist him; it was a case of laceration of perineum. The German calculation of the period of gestation is two hundred and seventy-six or two hundred and seventy-eight days. No reason is assigned why German gestation should differ from any other, and it may safely be assumed that nature develops her processes alike here and there.

Dr. John F. Dillon practices in a fertile district, as appears from his testimony, for in the course of three years he has had about one thousand cases in obstetrics, averaging more than one case a day, excluding Sundays, for it is supposable that this bright and energetic young doctor (who belongs also to "the old and only school") had an occasional Sunday off from his general delivery business at the corner of Fourth and Harrison streets. Doctor Dillon gave his opinion that attenu-

ated and abbreviated nails indicate premature birth; he also said that two hundred and eighty days is the average period of gestation; he meant ten lunar or nine calendar months. Dr. Walton Preston had testified that in his twenty-three years of practice in various places he had delivered from six hundred to eight hundred children.

Dr. Washington Ayer may be considered as a patriarch among the physicians of the regular old school, for fifty years engaged in active practice of medicine and surgery, modest withal in his enumeration of achievements in his art, for he simply says that although in a general family practice for half a century he has "had many accouchments during that time"; he says that the usual period of gestation is nine months or two hundred and seventy-five to two hundred and eighty days. The signs of premature birth are lack of development, the general appearance of the child without noting any particular marks upon it; there is no infallible sign. If it is seven or eight months there would be an arrest of development of nails; as it approached toward the full period, eight months say, there would be nothing that would be reliable whatever, except the general appearance of the child would indicate the period of maturity, the term of gestation. A seven months' child has been generally considered more likely to live than an eight months' child. Where an eight months' child is born, it is usually almost invariably where women have borne children and the womb becomes enfeebled, the appendages changing place in the structure of the membranes of the womb, producing fatty degeneration or calcareous formation—this would bring about a condition of malnutrition, with the consequence of premature birth, and the child would carry that feebleness with it and would die of inanition. Dr. Ayer says that so far as his observation has extended in the course of his fifty years of experience, children born at a period of eight months' gestation survive but a short time, about nineteen out of twenty perish; hardly five per cent of survivals. The first child is less likely to be eight months than the after-born children. Assuming that a man and woman are married on January 6, 1895; the man dies on January 28, 1895; there is a child born to the woman on September 16, 1895; a period of gestation of two hundred and fifty-three days,

if the child was a strong, healthy child, "as healthy as the average child," no defects in its development, Dr. Ayer thinks that his judgment on such hypothesis would be erroneous. In such a case this expert physician thinks that it was within the period of gestation, or that gestation must extend beyond the time stated—that is to say, that conception must have preceded marriage. If a child was born in two hundred and fifty-three days after conception and was perfect in every way except its finger and toe nails were shorter than they should be, Doctor Ayer would not attach any importance to the lack of nail development, and he would not say that a seven and three-quarters pound child, eating regularly and healthy in every respect, was a premature child. A healthy child during the first few days after birth sleeps all the time except when nursing. As the result of his own observation comprehending more than a generation, including attendance on over two thousand births, Dr. Ayer cannot call to mind any case where an eight months' child survived. The period or liability of life in such case is very brief; very short, indeed. After a series of definitions of anasarca, cystitis or inflammation of the bladder, Bright's disease, and kindred ailments, the hypothetical question was addressed to this doctor: Assume a man sixty-three years of age; well built; about five feet and five inches in height; weighing about one hundred and fifty pounds; suffering from Bright's disease and anasarca to such an extent that he died on the twenty-eighth day of January, 1895—would it have been possible for him to have had sexual intercourse on the 6th of January, 1895? To which question Dr. Ayer made answer that he did not think it would be possible; it would not have been probable. Where there is anasarca, any dropsical affection, the corpuscles of the blood lose tone; they lack stimulant to muscular fiber, and consequently would not stimulate the erecticle tissue enough for the performance of the marital rite of coition; there could be no coition. It would not be possible in the assumed case for him to have had sexual intercourse every night from January 6th to January 28th, or at all. Usually death is sudden in case of Bright's disease; at the end some premonition of death for a few days prior thereto is shown, but usually it comes very sudden at last. The constitutional

condition and habits of life being average throughout, the patient's period of life might be protracted a year.

There is a somewhat musty proverb as to the effect of the disagreement of doctors; in this case the court must decide upon the apparent conflict of evidence. There are three physicians who testify one way, one who expresses a contrary opinion—three to one; no difficulty if numbers count. But the law says that numerical force must yield to superior quality; hence, we have undertaken a sort of analysis qualitative and quantitative of the doctors' dicta. Dr. Preston says that it is an exploded idea that an eight months' child is less likely to live than one born in seven months. Dr. Harris considers the chances equal; Dr. Dillon thinks the eight months' child has a vital advantage. Dr. Preston has practiced twenty-three years, Harris twenty, Dillon three; the sum of the experience in years of these three medical gentlemen is forty-six; the extreme estimate of the number of cases attended by them is eighteen hundred. Dr. Ayer, opposed in opinion to these three, has been fifty years in active practice as a general family physician, forty-eight years continuously in San Francisco, and has attended over two thousand births. All other things being equal, credit, character, capacity, what principle of evidence turns the scale? It is that which is expressed in the statute, that the court is not bound to decide in conformity with the declarations of any number of witnesses against a less number or against a presumption or other evidence satisfying the judicial mind; and the application of this principle gives greater force to the opinion of Dr. Ayer than that of the three learned doctors who differ from him.

Doctor Ayer has spent more years in the practice of his profession and has had more experience in the obstetric art than all the others combined, and he is certainly their professional peer. In endowment of education and character he is, on this record, at least equal to his younger brethren who have testified and outranks them in the duration and area of his practice, and he declares that he has never known a case of an eight months' child that has survived more than a short time; out of two thousand cases in the course of fifty years he could not recall a single case of such survival; and the shortness of nails is in itself a matter of no importance.

Relatively Dr. Ayer's testimony seems most trustworthy. From the medical testimony herein collated no other conclusion can be reached by the court than that the infant came forth in the natural order and in due season—that is to say, that the period of gestation was nine calendar months, or approximately two hundred and eighty days; and that, consequently, the child must have been conceived prior to the sixth day of January, 1895, the date of the alleged contract marriage; and from all the evidence, medical and other, that deserves credence, the court deduces the conclusion that the decedent was so far the victim of diseases that impaired his generative power that he was incapable of procreation and, hence, was not, and could not have been, the father of the child or any other child. He was destitute entirely of propagative faculty.

It is claimed by counsel for the claimants that the genuineness of the signature of Dr. James to the written consent is proved by the testimony of Laura, who saw him sign it; by his admission of the writing to Dr. and Mrs. Milen; by the admission of the marriage by Dr. James to Mrs. Dickman and to Dr. Terry and son, as this admission comprehended the signing of the written consent to marriage, and by the introduction to Williams and Bigley of his wife, which also involved an admission of the marriage and of the written consent connected therewith; by the written consent having been found in the desk of Dr. James, which desk was locked and sealed the day after his death, and by the testimony of Rufus C. Hopkins, an eminent expert and respected octogenarian and pioneer, a man of half a century's experience in the examination of handwriting, well known to the court and to the community for his exalted character and prime capacity in his specialty.

Against the opinion evidence of Mr. Hopkins is the testimony of Mr. Gustav Folté and Mr. Albert M. Whittle, connected as paying teller with two savings banks in which the decedent was a depositor, each of whom knew Charles A. James and saw him often sign his name for many years in the books of their banks, and both of whom from that knowledge and comparison with admittedly authentic signatures pronounce the signature "Chas. A. James" on the alleged marriage con-

tract to be a forgery and a simulation of the signature to the paper marked in evidence "Mrs. James' Exhibit 8A," which is here transcribed.

Written on a printed heading:

"(16) ☞ Please send answer by
Wells, Fargo & Co.'s Express.

"San Francisco, Jany. 16th, 1895.
"Theo. Milen, M. D.

"Inclose I send you money order on W. F. & Co., San Jose, for Twenty-five dollars at your and wife's request. Please return at your earliest convenience and oblige

"CHAS. A. JAMES,
"925 Howard St.,
"San Francisco.

"(Mem. The original was written in black ink on yellow paper. This is here inscribed in red ink to indicate it as an exhibit.)"

Mr. Folté, of the German Bank, examined both papers and came to the conclusion that the signature to the alleged marriage contract is not genuine, but a copy of the signature to the authentic document herein immediately above transcribed; "there are scarcely two millimeters difference," an almost infinitesimal appreciation of space. One twenty-fifth part of an inch of our English measurement is equal to one millimeter. Mr. Folté does not think the signature on the contract is a tracing but a copy. The general character of the signature on Exhibit 8A, the letter to Dr. Milen, is that of freedom, regularity and lack of hesitation; in the subscription to the alleged contract there is an absence of regularity and marks of hesitation. No man writes a signature twice alike.

Mr. Whittle, of the Savings Union, familiar for nineteen years with the signature of Chas. A. James as a depositor in that institution, was of the opinion that the signature to the alleged marriage contract was a copy of the signature to the paper "Mrs. James' Exhibit 8A." It was not a tracing but an imitation and a very close one. Mr. Rufus Clement Hopkins, to whom, as an expert, counsel and court have paid

merited tribute, scrutinized several documents said to be authentic signatures of decedent and after comparison with the disputed signature pronounced the latter genuine. Mr. Hopkins examined and made tracings of the signatures of twelve admittedly authentic papers in evidence, and compared them with the signature to the disputed contract, concluding from the comparison that the contract signature was authentic. General Hart, of counsel for claimant, considers these tracings, which were given for the purpose of showing approximately the character of the signature of decedent with respect to uniformity and other features that give expression to handwriting and indicate the authorship of the script, and the counsel thinks these tracings are sufficiently exact as compared with the original to serve that purpose, and claims from these tracings that it is clear that decedent had no fixed or stereotyped habit or form in signing his name, and that while all of his signatures bear a characteristic family resemblance, they differ in features as much as the children of the same parents differ from each other; but it may be added to this argument, that there are sometimes twins in a family group, and the subscriptions to the two papers, "Mrs. James' Exhibit 3" and "Mrs. James' Exhibit 8A," may be categorized as twin signatures. General Hart exclaims interrogatively, "If this marriage contract be a forgery, where did the forger find the model or exemplar?" The answer is made by the adverse counsel that it was found in the paper coming from the claimants' side marked "Mrs. James' Exhibit 8A," and the counsel so answering, Mr. George D. Shadburne, is impressed with the idea that the contract signature is a tracing the signature on that exemplar, the letter to Dr. Milen. and Mr. Shadburne thinks that an examination of the paper "Mrs. James Exhibit 8A" will demonstrate this idea indubitably; mark the condition of the yellow paper, pinholes and creasings and other indicia of fabrication. All this may be so—there are certainly symptoms of tracing—but the evidence does not favor this theory so much as it does that of copying or imitation, and the very discrepancies between the two signatures fortify the opinion that the final form of forgery adopted was the latter, although tracings may also have been tried. "No man writes his signature twice alike,"

say the experts; even twins are in some details discrepant to the sharp scrutineer; and applying this general philosophy to the particular proposition, there may be found in these twin signatures the following discrepancies:

In the entire length of the name from the beginning of the point in the capital letter "C" to the end of the point in the letter "s" in "James" there is a difference of one-sixteenth of an inch.

Exhibit 8A being one-sixteenth of an inch longer than that of Exhibit 3. The cause being that the tail in the "s" is longer in 8A than in 3.

The length of the capital "C" in Exhibit 3 is one-sixteenth of an inch longer than in Exhibit 8A.

The length of the loop of the capital "C" is one thirty-second of an inch longer than in Exhibit 8A.

There is a slight difference in the ending of the capital "C," the one in Exhibit 8A ending with a sort of a curve.

The "s" in "Chas." in Exhibit 3 is one thirty-second of an inch longer than in Exhibit 8A.

The capital "A" is one thirty-second of an inch longer in Exhibit 8A than in Exhibit 3.

The upper loop in the letter "J" in the Exhibit 3 is somewhat flat in comparison with that of Exhibit 8A.

The lower loop in the capital "J" in the Exhibit 8A is one-sixteenth of an inch longer than in the Exhibit 3.

In the word "James" the letters "a" and "e" in Exhibit 8A are more in a direct line than in Exhibit 3.

In Exhibit 3 it will be observed that these two letters are somewhat elevated above the line.

It is also noticeable that the "s" in "Chas." in Exhibit 3 ends with a tail thus, "Chas.," while there is scarcely any caudal appendage in the terminal "s" in Exhibit 8A: "Chas."

A remarkable feature of the two signatures is that the angles of the different letters are identical. This can be more readily observed by measuring the distance from the edge of both documents to the beginning of the name, or any part thereof, and it will be noticed that there is not the slightest difference in any part of the name,

These comparisons suggest the counterfeit. The trivial discrepancies indicate imitation—here is where the work of the forger is found out; some small slip in simulation leads to detection, where all else is identity in form. There is always a clue to crime even though the criminal be not caught.

This alleged contract is a forgery beyond any shadow of doubt; there is no escape from this conclusion upon the evidence as presented and herein examined and analyzed. But how, asks counsel for claimants, did that contract get into the desk of the deceased? It is patent from the circumstances that it was put into that desk between the 2d and 22d of February, 1895. The testimony of Cluen and Herrin shows that it was not there when the desk was first examined after the death of Dr. James, on the 2d of February, 1895, when a thorough examination was made of the contents. Then the desk was locked by the public administrator's clerk and he put his official seal, a common stamped circular paper seal, over the keyhole. Afterward, on February 25, 1895, there was another examination and an exhibition in which there was dramatically developed from that self-same secretary the desired document. Claimant knew of its existence and whereabouts on the 2d of February, 1895. She knew when the public administrator presumed to take possession of her premises that the paper attesting her right was in that receptacle, and once produced no one would dare to trespass upon her domain. She saw her husband after the contract was executed place it in that repository, so she testified on February 21, 1895, and it was either there or next his heart in his vest pocket, yet it was sought out in neither place; nor was its existence proclaimed either from housetops or in the silent sanctuary wherein lay the enshrouded body of her departed husband and father of her prospective child. Neither at the wake nor at the funeral from the house nor at the interment in the cemetery was there aught to indicate that claimant was wife or widow. She was present when Dr. James died, say her counsel, but the evidence is uncontradicted that she made no sign of mourning such as a suddenly bereaved wife would naturally exhibit. Unless she were a very clod, instead of a young and tender woman, made widow without warning, she would have given vent to uncontrollable

emotion of grief at such a domestic catastrophe. "She manifested her affection by dropping a rose in his grave," say her advocates, and then in company with her chaperon, Mrs. Jessie Milen, she leaves the cemetery and returns to their lodgings, without the slightest allusion to her rights as widow.

The condition of the desk and the appearance of the seal indicate that they were tampered with. The seal could easily have been removed and replaced, and no such flimsy affair should be employed by a public officer for so important a purpose. The inference from the evidence is irresistible that this forged paper was inserted in that desk and the seal taken off and, when the purpose was accomplished, reattached; the whole scheme is artificial and apparent. Meanwhile the story of the marriage was concocted, "a story of love and passion"; fatuous old December engaged in dalliance futile, perhaps fertile, with blithe young May; the antique tale of Winter lingering in the lap of Spring—all very romantic, but quite untrue; mere material for a new novel in which may be inwrought the letters so carefully contrived to support claimant's case and put up the same as any other prescription by the doctor in this drama. This claimant never asserted herself as widow until about February 13, 1895, when the telegram was sent to Dr. Milen in San Jose that she was pregnant. Prior to that time no such pretension was put forth; even in her own household her brother in law Dickman ridiculed the idea, as his testimony shows. He never believed the story, and knew it was an invention. As his telegram and letter to Miss Mattie James in the east clearly establish, he had no faith in any such preposterous pretensions, and he clearly wanted to corner the heirs by obtaining a power of attorney carefully prepared for that purpose and in evidence here.

The testimony on both sides of this case has been reviewed with care, and I think the abstract given in this opinion omits no matter essential to a correct conclusion, and contains nothing irrelevant or immaterial. It has not been deemed necessary to condense character evidence or to allude to it; the facts of the case are here. The claimant and her stepmother have in about every instance where the respondents intro-

duced witnesses against them met such statements with prompt and point blank denials; everything contrary to their stories was absolutely and totally false, no matter how strong the inherent probability of those witnesses nor how compact the circumstances nor how reputable and uninterested such persons so testifying might be—they were all utterers of untruth; but this controversy must be determined by the whole record, and by that record the claimants must stand or fall.

Upon the record here presented, this court pronounces judgment: 1. That the alleged contract is not legal in form, according to the decisions of the supreme court; 2. That the alleged contract is a forgery; 3. That there was no mutual assumption of rights, duties or obligations marital, and that they never lived together as husband and wife; 4. That the child claimant is not the child of the decedent, Charles A. James.

Application denied as to Laura Milen James and Theodore Milen James; granted as to absent heirs.

#### FINDINGS.

The applications for distribution herein came on regularly for hearing before the court sitting without a jury, a jury trial thereof having been duly waived, Messrs. W. H. H. Hart, Geo. W. Fox and Aylett R. Cotton representing Laura Milen James (so called) and Theodore Milen James (so called), and Geo. D. Shadburne, Esq., representing the absent heirs of said deceased, on the ninth day of December, 1896, and was on hearing from day to day until the twelfth day of March, 1897, during which time the evidence, oral and documentary, of the contestants was educed and presented, whereupon after the argument of counsel said applications were duly submitted to the court for its decision, and now after mature deliberations the court finds the following:

#### FACTS.

I. That Charles A. James died intestate in the city and county of San Francisco, state of California, on the twenty-eighth day of January, 1895, leaving him surviving: 1. P. M. James; 2. Chas. T. James; 3. Nathan W. James; 4. Francis

T. Broughton; 5. Lucy A. Nichols; 6. William J. Clark; 7. Lydia E. Hoxie; 8. Geo. W. Clark; 9. Hannah A. Wadsworth; 10. Amy A. Reisch; 11. William Henry Barber; 12. Mattie E. James; 13. Daniel M. James; 14. Elizabeth E. Barber; 15. Lydia L. Hopkins; and 16. Willard B. James, who are of the following degrees of relationship to said deceased, to wit:.

1. P. M. James, Chas. T. James, Nathan W. James, Francis T. Broughton, and Lucy A. Nichols, who are the issue of Peleg W. James, a deceased brother of said Charles A. James, deceased.

2. William J. Clark, Lydia E. Hoxie, Geo. W. Clark, Hannah A. Wadsworth and Amy A. Reisch, who are the issue of Rocellany E. Clark (née James), a deceased sister of said Charles A. James, deceased.

3. William Henry Barber, who is the issue of Mary A. Barber (née James), a deceased sister of said Charles A. James, deceased.

4. Mattie E. James, who is the issue of Thomas A. James, a deceased brother of said Charles A. James, deceased.

5. Daniel M. James, who is a brother of said Charles A. James, deceased.

6. Elizabeth E. Barber (née James), who is a sister of said Charles A. James, deceased.

7. Lydia L. Hopkins (née James), who is a sister of said Charles A. James, deceased. And

8. Willard B. James, who is a brother of said Charles A. James, deceased.

II. That all the above-named nephews and nieces, brothers and sisters of said Charles A. James, deceased, are and at all times mentioned in their petition herein were nonresidents, to wit, residing out of the state of California.

III. That on the twenty-first day of February, 1895, Andrew C. Freeze, Esq., was, by the order of said Superior Court, duly entered and made, duly appointed the administrator of the Estate of said Charles A. James, deceased, and his powers as such administrator have never been revoked.

IV. That thereafter, to wit, on the twenty-first day of February, 1895, notice to creditors to present their claims against said estate were duly published.

V. That thereafter, to wit, on the fourth day of March, 1896, said administrator presented his account of his administration to said court for allowance, and the same was duly allowed and settled on the twentieth day of March, 1896.

VI. That all the claims against said deceased presented to said administrator and all the taxes against said estate have been and were at the time of filing said applications for distribution herein paid and discharged, and said estate was then and is now ready for distribution.

VII. That the residue of said estate now remaining in the hands of said administrator is that certain real estate situate in said city and county, bounded and described as follows, to wit: Commencing at a point on the southeasterly line of Howard street, distant thereon 75 feet southwesterly from the southerly corner of 5th and Howard streets; thence southwesterly along the southeasterly line of Howard street 25 feet; thence at right angles southeasterly 80 feet; thence at right angles northeasterly 25 feet and parallel with Howard street, and thence at right angles northwesterly 80 feet to the point of commencement, together with the improvements, consisting of a three-story frame building and the appurtenances appraised at $15,000; also, personal property consisting of cash on hand about $31,000; and the following jewelry, to wit: One small gold ring; one large gold ring; one gold ring with five diamonds; one amethyst set consisting of brooch and earrings; one diamond stud; three yellow metal collar buttons; one gold watch No. 10095, J. W. Tucker, maker; one gold chain; one pair of diamond earrings containing six stones each; one pair gold bracelets, containing nine diamonds each, and one gold cross containing sixteen diamonds.

The furniture has hitherto been sold by the administrator under the order of the court.

The wearing apparel of Chas. A. James, deceased, and of his deceased wife, Susan K. James, have not been accounted for by said administrator. The above residue of property is subject to expenses of administration and counsel fees for absent heirs, which have not been settled or allowed.

VIII. That Laura Milen James (so called) never was at any time the wife or widow of said Charles A. James, either by contract or otherwise.

IX. That Theodore Milen James (so called) is not the child of said Charles A. James, legitimate or illegitimate, or otherwise.

X. That said Charles A. James left him surviving neither issue, surviving wife, father nor mother.

XI. That all of the property aforesaid was the separate property of said Charles A. James, deceased.

From the foregoing facts the court finds the following

### CONCLUSIONS OF LAW.

That P. M. James, Chas. T. James, Nathan W. James, Francis T. Broughton, Lucy A. Nichols, William J. Clark, Lydia E. Hoxie, Geo. W. Clark, Hannah A. Wadsworth, Amy A. Reisch, William Henry Barber, Mattie E. James, Daniel M. James, Elizabeth E. Barber, Lydia L. Hopkins and Willard B. James, are the next of kin and heirs at law of said Charles A. James, deceased, and as such are entitled to inherit his estate—to the brothers and sisters in equal degree, and the nephews and nieces by right of representation.

Let a decree of distribution be entered accordingly.

---

*The Principle Case Was Appealed* to the supreme court and reversed on questions of evidence. No new trial of the case was had, however, and the judgment of the trial court stands as originally rendered. Hence it may well be doubted whether the action of the appellate tribunal materially affects the decision of the lower court as an authority.

### COMMON-LAW MARRIAGES.

**Marriage as a Civil Contract.**—Marriage is a civil contract, depending for its validity upon the free consent of parties not laboring under any legal disability, and upon nothing else in the absence of positive statutory declarations to the contrary: Brisbin v. Huntington, 128 Iowa, 166, 103 N. W. 144; Floyd County v. Wolfe (Iowa), 117 N. W. 32; Hulett v. Carey, 66 Minn. 327, 61 Am. St. Rep. 419, 69 N. W. 31, 34 L. R. A. 384; Keen v. Keen, 184 Mo. 358, 83 S. W. 526; Voorhees v. Voorhees' Exrs., 46 N. J. Eq. 411, 19 Am. St. Rep. 404, 19 Atl. 172; Di Lorenzo v. Di Lorenzo, 174 N. Y. 467, 95 Am. St. Rep. 609, 67 N. E. 63, 63 L. R. A. 92; Commonwealth v. Haylow, 17 Pa. Super. Ct. 541. To quote from Cartwright v. McGown, 121 Ill. 388, 2 Am. St. Rep. 105, 12 N. E. 737: "A marriage is a civil contract, made in due form, by which a man and woman agree to take each other for husband and wife, during their joint lives, unless it is annulled by law, and to discharge toward each other the duties

imposed by law upon such relation. Each must be capable of assenting, and must in fact, consent, to form this new relation."

Marriage as a Status.—But while the law defines marriage as a civil contract, and such indeed it is, it is something more than a mere contract, for it creates a status or relation as much as that of parent and child, which the parties of themselves cannot dissolve: Willits v. Willits, 76 Neb. 228, 107 N. W. 379, 5 L. R. A., N. S., 767; Hilton v. Roylance, 25 Utah, 129, 95 Am. St. Rep. 821, 69 Pac. 660, 58 L. R. A. 723; Holmes v. Holmes, Fed. Cas. No. 6638, 1 Saw. 99. "Marriage is more than a mere civil contract for the establishment and maintenance by the parties to it of certain relations to each other. It involves, except in so far as it has been modified by statute, an intimate personal union of those participating in it of a character unknown to any other human relation, and it creates a civil status, the maintenance of which in its full integrity is vital to the moral welfare of society": Taylor v. Taylor (Md.), 69 Atl. 632. Said the supreme court of Missouri: "Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting is essential. While it is here declared to be a civil contract, it is almost universally held to be something more than an ordinary contract. Marriage is a status, created by contract, and we formulate the definition of it as follows: Marriage is the civil status of one man and one woman, capable of contracting, united by contract and mutual consent for life, for the discharge, to each other and to the community, of the duties legally incumbent on those whose association is founded on the distinction of sex": State v. Bittick, 103 Mo. 183, 23 Am. St. Rep. 869, 15 S. W. 325, 11 L. R. A. 587. "What persons establish by entering into matrimony is not a contractual relation, but a social status; and the only essential features of the transaction are that the participants are of legal capacity to assume that status, and freely consent to do so": University of Michigan v. McGuckin, 64 Neb. 300, 89 N. W. 778, 57 L. R. A. 917.

Essentials of Common-law Marriage.—The mutual agreement to be husband and wife in praesenti by a man and woman capable of assuming that relation, especially if followed by matrimonial cohabitation, constitutes a common-law marriage, without any necessity for a solemnization or formal ceremony of any kind: Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Rep. 245; Smith v. Fuller (Iowa), 108 N. W. 765; Laurence v. Laurence, 164 Ill. 367, 45 N. E. 1071; McKenna v. McKenna, 73 Ill. App. 64; Hutchinson v. Hutchinson, 96 Ill. App. 52, 196 Ill. 432, 63 N. E. 1023; Porter v. United States (Ind. Ter.), 104 S. W. 855; State v. Walker, 36 Kan. 297, 59 Am. Rep. 556, 13 Pac. 279; Matney v. Linn, 59 Kan. 613, 54 Pac. 668; Williams v. Kilburn, 88 Mich. 279, 50 N. W. 293; State v. Worthingham, 23 Minn. 528; Dickerson v. Brown, 49 Miss. 357; Floyd v. Calvert, 53 Miss. 37; Dyer v. Brannock, 66 Mo. 391, 27 Am. Rep. 359; Eaton v. Eaton, 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605; Voorhees v. Voorhees'

Exrs., 46 N. J. Eq. 411, 19 Am. St. Rep. 404, 19 Atl. 172; Carmichael v. State, 12 Ohio St. 553; Ingersol v. McWillie, 9 Tex. Civ. App. 543, 30 S. W. 56; Overseers of Poor of Town of Newbury v. Overseers of Poor of Town of Brunswick, 2 Vt. 151, 19 Am. Dec. 703; Mathewson v. Phoenix Iron Foundry, 20 Fed. 281; United States v. Route, 33 Fed. 246; Holabird v. Atlantic Mut. Life Ins. Co., Fed. Cas. No. 6587, 2 Dill. 166.

Proof of Contract.—A marriage contract may, like other contracts, be proved by the signature of the parties or by witnesses who were present when it was made: In re Imboden's Estate, 111 Mo. App. 220, 86 S. W. 263; Commonwealth v. Stump, 53 Pa. 132, 91 Am. Dec. 198. If such evidence is wanting, then marriage may be proved from cohabitation, reputation, conduct and other circumstances (Smith v. Fuller (Iowa), 108 N. W. 765; Pourier v. McKenzie, 147 Fed. 287), of which more will be said hereafter. While the evidence to establish a common-law marriage should be clear, consistent and convincing (In re Rossiquot's Will, 112 N. Y. Supp. 353), still each fact and circumstance relied upon need not be so conclusively proved that no other reasonable conclusion from the evidence can be drawn; it is enough that all the facts and circumstances are fairly sufficient to justify a finding in favor of the marriage: Edelstein v. Brown (Tex. Civ. App.), 95 S. W. 1126.

Conflict of Laws.—The rule that a marriage, valid in the state or country where entered into, is valid in every other state or country, unless there prohibited by some positive rule of law or public policy (Succession of Gabisso, 119 La. 704, 121 Am. St. Rep. 529, 44 South. 438, 11 L. R. A., N. S., 1082; Commonwealth v. Graham, 157 Mass. 73, 34 Am. St. Rep. 255, 31 N. E. 706, 16 L. R. A. 578; Pennegar & Haney v. State, 87 Tenn. 244, 10 Am. St. Rep. 648; State v. Shattuck, 69 Vt. 403, 60 Am. St. Rep. 936, 38 Atl. 81, 40 L. R. A. 428; Willey v. Willey, 22 Wash. 115, 79 Am. St. Rep. 923, 60 Pac. 145), applies to common-law marriages: Darling v. Dent, 82 Ark. 76, 100 S. W. 747; Smith v. Smith, 52 N. J. L. 207, 19 Atl. 255; Estate of McCausland, 213 Pa. 189, 110 Am. St. Rep. 540, 62 Atl. 780. Hence, a common-law marriage contracted in a state where such marriages are valid may be recognized in another state where such marriages cannot be entered into: Nelson v. Carlson (Wash.), 94 Pac. 477.

A marriage by contract in one state, followed by cohabitation in another state, was held valid in Gibson v. Gibson, 24 Neb. 294, 39 N. W. 450. And where the question as to the validity of a common-law marriage arose in Alabama after there had been cohabitation in Kentucky and in Ohio, the supreme court of Alabama said: "Although the statutes of Kentucky declare every marriage void unless solemnized in the manner provided therein, and a common-law marriage cannot be contracted in that state, yet evidence was properly admitted to show that the cohabitation, which began and continued for ten years in Ohio, where the common law is presumed to prevail, and where a common-law marriage is valid, in the absence of a

statute expressly prohibiting such marriage, was continued for two years longer in Kentucky. Such evidence was not admissible to prove that the marriage relation grew out of the cohabitation in Kentucky, or that the cohabitation became lawful in Kentucky by the parties agreeing in that state to be man and wife; but it was clearly admissible to strengthen the presumption that the cohabitation in Ohio was lawful. It is always competent, on an issue of marriage vel non, to show the duration of the cohabitation": Moore v. Heineke, 119 Ala. 627, 24 South. 374.

**Effect of Common-law Marriage.**—A common-law marriage confers upon the parties all the rights and subjects them to all the duties and obligations usually incident to the marriage relation when entered into in accordance with the written law: Steves v. Smith (Tex. Civ. App.), 107 S. W. 141; Davis v. Pryor, 112 Fed. 274, 50 C. C. A. 579. If the father and mother of a child, soon after its birth, agreed with each other in one state to become, and live together as, husband and wife until parted by death, thereafter continuing to live together as, and holding themselves out to the world to be, husband and wife, such contract of marriage legitimates their child, not only in that state, but also in another state where a common-law marriage is recognized as valid: McCausland's Estate, 213 Pa. 189, 110 Am. St. Rep. 540, 62 Atl. 780. And in case of the wrongful death of a man, his wife and children by a common-law marriage may recover damages therefor: Galveston, H. & S. A. Ry. Co. v. Cody, 20 Tex. Civ. App. 520, 50 S. W. 135.

**Necessity for Agreement.**—It is essential to a common-law marriage that there shall be a mutual agreement between the parties to assume toward each other the relation of husband and wife. Cohabitation without such an agreement does not constitute marriage: Compton v. Benham (Ind. App.), 85 N. E. 365; Commonwealth v. Stevens, 196 Mass. 280, 82 N. E. 33; and an agreement to live together is not marriage, if there is no agreement to live as husband and wife: Soper v. Halsey, 85 Hun, 464, 33 N. Y. Supp. 105.

**Form of Agreement.**—No particular words, however, are necessary to constitute a valid marriage by mutual agreement; if enough is said and done to evidence an intention by the parties to assume a marital relation, this is sufficient whatever may be the form of expression employed. But enough must be said and done to show such intention: Mickle v. State (Ala.), 21 South. 66; Heymann v. Heymann, 218 Ill. 636, 75 N. E. 1079; Bowman v. Bowman, 24 Ill. App. 165; Marks v. Marks, 108 Ill. App. 371; Clancy v. Clancy, 66 Mich. 202, 33 N. W. 889; State v. Hansbrough, 181 Mo. 348, 80 S. W. 900; In re Hines' Estate, 7 Pa. Dist. Ct. 89. The intention of the parties is to be gathered from the circumstances attending the contract, rather than from mutual reservations or secret intentions of either party: In re Imboden's Estate, 111 Mo. App. 220, 86 S. W. 263. If there is an agreement, followed by cohabitation, a marriage

is established, regardless of what the parties consider the legal effect of the contract: Tarrt v. Negus, 127 Ala. 301, 28 South. 713.

**Implied Contracts.**—While some doubt has been expressed on the question, still it would seem clear that to constitute a common-law marriage, an express agreement is not essential, but a contract to live together as husband and wife may be implied from the acts and conduct of the parties; and that a contract so implied has all the force and effect of a contract expressed in written or spoken words: Hilton v. Roylance, 25 Utah, 129, 95 Am. St. Rep. 821, 69 Pac. 660, 58 L. R. A. 723; Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568. "If a marriage contract need not be evidenced by writing, and of course it need not be, we can conceive of no reason why it may not, like many other civil contracts, be evidenced by acts and conduct from which its making ore tenus may be presumed": Renfrow v. Renfrow, 60 Kan. 277, 72 Am. St. Rep. 350, 56 Pac. 534. "We must start, therefore, in the examination of this case," said the New York court, "with the fact that the living together of these two people, so far as they did live together, was not preceded by any ceremonial marriage, or by any express agreement that they should live together as man and wife. No ceremony is necessary to create the relation of man and wife in this state. The contract of marriage, so far as its inception goes, is regarded as is any other contract, and it may be begun by an agreement between the two interested parties that they assume toward each other the relation of husband and wife. That agreement, if it is not proven in express terms by competent evidence, may be established by the facts of cohabitation and reputation among their friends and neighbors, and of recognition of each other as holding that relation: Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Hynes v. McDermott, 10 Daly, 423, affirmed 91 N. Y. 451, 43 Am. Rep. 677. But these facts, of themselves, do not constitute a marriage. They are simply evidence from which, if sufficiently strong, the courts are at liberty to infer that the cohabitation was the result of a previous agreement to become man and wife, and from that fact to infer further that a marriage actually existed between the parties: Gall v. Gall, 114 N. Y. 109, 21 N. E. 106. It is quite true that it has been said that the presumption of marriage arising from cohabitation, apparently matrimonial, is one of the strongest known to the law. In many cases this is undoubtedly the fact. But this presumption is indulged in in the interest of decency and clean living, and because of the preference which the law has for orderly and decent conduct as against licentiousness. The inference is not made for the benefit of either party to the alleged contract": In re Brush, 25 App. Div. 610, 49 N. Y. Supp. 803.

**Agreement in Words of Present Tense.**—There is no doubt, in the absence of a positive statutory declaration to the contrary, that where a man and woman agree in words of the present tense to take each other as husband and wife, and then in pursuance of the agree-

ment assume marital relations, a valid marriage is accomplished. This is the usual form of a common-law marriage, and technically is styled marriage per verba de praesenti: Hutchinson v. Hutchinson, 196 Ill. 432, 63 N. E. 1023; Shorten v. Judd, 60 Kan. 73, 55 Pac. 286; Hutchins v. Kimmell, 31 Mich. 126, 18 Am. Rep. 164; Dyer v. Brannock, 66 Mo. 391, 27 Am. Rep. 359; Atlantic City R. Co. v. Goodin, 62 N. J. L. 394, 72 Am. St. Rep. 652, 42 Atl. 333, 45 L. R. A. 671; Travers v. Reinhardt, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.

Agreement to Marry in Future.—An agreement to marry in the future, followed by cohabitation, does not constitute marriage. In other words, a man and woman, engaged to be married in the future, who live together as husband and wife when they do not understand themselves to be such, and are looking forward to a marriage in the future, are not husband and wife in the eye of the law: Robertson v. State, 42 Ala. 509; Farley v. Farley, 94 Ala. 501, 33 Am. St. Rep. 141, 10 South. 646; Port v. Port, 70 Ill. 484; Hebblethwaite v. Hepworth, 98 Ill. 126; Stoltz v. Doering, 112 Ill. 234; Judson v. Judson, 147 Mich. 518, 111 N. W. 78; Sorensen v. Sorensen, 68 Neb. 483, 94 N. W. 540, 98 N. W. 837, 100 N. W. 930, 103 N. W. 455; Cheney v. Arnold, 15 N. Y. 345, 69 Am. Dec. 609, and note; Duncan v. Duncan, 10 Ohio St. 181; Estate of Grimm, 131 Pa. 199, 17 Am. St. Rep. 796, 18 Atl. 1061, 6 L. R. A. 717; Peck v. Peck, 12 R. I. 485, 34 Am. Rep. 702. Nevertheless, when cohabitation follows an agreement to marry in the future, it is presumed to be in fulfillment of such agreement and in consummation of actual marriage. A matrimonial union thus effected is a valid common-law marriage, and is denominated a marriage per verba futuro cum copula. But this rule that the copula or cohabitation is presumed to be in fulfillment of the previous promise to marry and hence to convert the executory agreement into an actual present marriage, is merely a rule of convenience, and may always be overthrown by evidence that the fact is otherwise: Cartwright v. McGown, 121 Ill. 388, 2 Am. St. Rep. 105, 12 N. E. 737; Hiler v. People, 156 Ill. 511, 47 Am. St. Rep. 221, 41 N. E. 181; McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641; Marks v. Marks, 108 Ill. App. 371; Hulett v. Carey, 66 Minn. 327, 61 Am. St. Rep. 419, 69 N. W. 31, 34 L. R. A. 384; Topper v. Perry, 197 Mo. 531, 114 Am. St. Rep. 777, 95 S. W. 203. "To constitute a marriage legal at common law the contract and consent must be per verba de praesenti, or if made per verba de futuro cum copula, the copula is presumed to have been allowed on the faith of the marriage promise, and that so the parties, at the time of the copula, accepted of each other as man and wife. It is not sufficient to agree to present cohabitation and a future marriage when more convenient. Where parties have contracted a common-law marriage, without any solemnization or other formality apart from the agreement itself, it is not requisite that the agreement should be made before witnesses. But such a marriage is to be distinguished from cases of seduction or sexual intercourse followed by a promise of marriage, and cases where

the intercourse in its inception is illicit and is known to be such by both parties": In re Maher's Estate, 204 Ill. 25, 68 N. E. 159.

Said the supreme court of Nebraska in a recent decision: "In states where no marriage celebration is necessary, and when such contract, is followed by sexual intercourse between the parties, the law, so as not to presume fornication, presumes that parties who have promised to marry mean sexual intercourse following such promise to be the consummation of such agreement. But this presumption may be rebutted by any facts which show that the parties knew or intended their intercourse to be illicit, as where at the time they were looking forward to being married with a ceremony: Peck v. Peck, 12 R. I. 485, 34 Am. Rep. 702; Fryer v. Fryer, Rich. Eq. Cas. 85. In Stoltz v. Doering, 112 Ill. 234, it is said: 'At common law the fact of sexual intercourse after an agreement to marry at a future day does not constitute marriage. The copula must have been in fulfillment of the agreement to marry. From these authorities it appears that the law, in the absence of evidence, raises the presumption that by the act of copula the parties then and there intended to consummate their existing agreement to marry—i. e., to. convert the future agreement into a present consummation. This is the whole doctrine of marriages de futuro cum copula. There is no difference in the basic principles of the marriage contract from any other. The minds of the parties must meet, and the agreement to marry must be made. The time when the marriage shall take place may be the present, or may be in the future. If in the future, there is not a present marriage, but an agreement to marry, and the mere act of copula does not change the agreement. The law presumes, in the absence of evidence, that the parties themselves changed the terms of the contract from the future to the then present. When, however, the evidence establishes, as in this case, that during the period of the sexual intercourse between the parties they had set the day in the future, and were making preparations for and intending to solemnize their marriage rites in accordance with the statute of this state, there is no ground for this presumption, and the law will not indulge it' ": Sorensen v. Sorensen, 68 Neb. 483, 94 N. W. 540, 98 N. W. 837, 100 N. W. 930, 103 N. W. 455.

Consent of Parties.—There can be no such thing as marriage without the consent of the parties. Contracts of marriage do not differ from other contracts in this respect; the first essential to their validity is the mutual assent of the parties: McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641; Hooper v. McCaffery, 83 Ill. App. 341; Roszel v. Roszel, 73 Mich. 133, 16 Am. St. Rep. 569, 40 N. W. 858; University of Michigan v. McGuckin, 64 Neb. 300, 89 N. W. 778, 57 L. R. A. 917; Keyes v. Keyes, 22 N. H. 553; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677; Jaques v. Public Admr., 1 Bradf. Sur. 499; Town of Mountholly v. Town of Andover, 11 Vt. 226, 34 Am. Dec. 685. "It is well established in this state," remarks the supreme court of Missouri, "that a marriage without observing the statutory regulations, if made

according to the common law, is a valid marriage, and that, by the common law, if the contract be made verba de praesenti, it is sufficient evidence of a marriage, or if made per verba de futuro cum copula, the cohabitation is presumed to be on the faith of the marriage promise. That is, however, merely a rule of evidence, and it is always competent, in such cases, to show by proof that the facts are otherwise. Under our law marriage is a civil contract, by which a man and a woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge toward each other the duties imposed by law upon such relation. Each must be capable of assenting and must, in fact, consent to form this new relation": Topper v. Perry, 197 Mo. 531, 114 Am. St. Rep. 777, 95 S. W. 203.

Necessity of Cohabitation.—The statement is sometimes met with that an assumption of the marriage status is essential to a common-law marriage; that an agreement presently to be husband and wife is not sufficient to constitute marriage until it is acted upon by the parties: McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641; Robinson v. Robinson, 188 Ill. 371, 58 N. E. 906; Lorimer v. Lorimer, 124 Mich. 631, 83 N. W. 609; Topper v. Perry, 197 Mo. 531, 114 Am. St. Rep. 777, 95 S. W. 203; Sorensen v. Sorensen, 68 Neb. 483, 94 N. W. 540, 98 N. W. 837, 100 N. W. 930, 103 N. W. 455. See, too, Hawkins v. Hawkins, 142 Ala. 571, 110 Am. St. Rep. 53, 38 South. 640. The statutes of California declare that "consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations." This assumption of the marital relation means cohabitation as husband and wife; mere copulation without such cohabitation is not enough: Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131; People v. Lehmann, 104 Cal. 631, 38 Pac. 422. Some of the decisions state that a present assumption of marital relations is necessary: McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641; Topper v. Perry, 197 Mo. 531, 114 Am. St. Rep. 777, 95 S. W. 203. But in California, if any length of time thereafter they assume the rights and duties of the marital relation, both understanding thereby to consummate the marriage covenant, a lawful marriage will result under the statute: In re Ruffino's Estate, 116 Cal. 304, 48 Pac. 127.

The true rule, however, is that a marriage is complete when the parties agree, in words of the present tense, to take each other as husband and wife. Cohabitation or copulation following such agreement may be evidence of the existence of the agreement, but it adds nothing to the agreement and is not essential to the validity of the marriage: Dumaresly v. Fishly, 10 Ky. (3 A. K. Marsh.) 368; Jackson v. Winne, 7 Wend. 47, 22 Am. Dec. 563. Said the supreme court of Minnesota in the leading case of Hulett v. Carey, 66 Minn. 327, 61 Am. St. Rep. 419, 69 N. W. 31, 34 L. R. A. 384: "Upon this state of facts the contention of the appellants is, that there was no marriage, notwithstanding the execution by them of the written contract;

that, in order to constitute a valid common-law marriage, the contract, although per verba de praesenti, must be followed by habit or reputation of marriage—that is, as we understand counsel, by the public assumption of marital relations. We do not so understand the law. The law views marriage as being merely a civil contract, not differing from any other contract, except that it is not revocable or dissoluble at the will of the parties. The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, whenever there is a present, perfect consent to be husband and wife, the contract of marriage is completed. The authorities are practically unanimous to this effect. Marriage is a civil contract jure gentium, to the validity of which the consent of parties able to contract is all that is required by natural or public law. If the contract is made per verba de praesenti, and remains, without cohabitation, or if made per verba de futuro, and be followed by consummation, it amounts to a valid marriage, in the absence of any civil regulations to the contrary. The maxim of the civil law was, 'Consensus non concubitus facit matrimonium.' The whole law on the subject is that, to render competent parties husband and wife, they must and need only agree in the present tense to be such, no time being contemplated to elapse before the assumption of the status. If cohabitation follows it adds nothing in law, although it may be evidence of marriage. It is mutual, present consent, lawfully expressed, which makes the marriage: 1 Bishop on Marriage, Divorce and Separation, secs. 239, 313, 315, 317. See, also, the leading case of Dalrymple v. Dalrymple, 2 Hagg. Const. 54, which is the foundation of much of the law on the subject." To the same effect is the recent case of Davis v. Stouffer (Mo. App.), 112 S. W. 282.

A mere agreement to be husband and wife, said the supreme court of Iowa, in Pegg v. Pegg (Iowa), 115 N. W. 1027, without a present intention to assume that relation, does not constitute marriage.

Cohabitation Without Agreement.—While marriage may be consummated without cohabitation, there can be no marriage without an agreement between the parties to be husband and wife. Cohabitation, in the absence of such agreement, does not amount to marriage. Cohabitation is evidence of marriage, but it does not of itself constitute marriage: Hawkins v. Hawkins, 142 Ala. 571, 110 Am. St. Rep. 53, 38 South. 640; Kilburn v. Kilburn, 89 Cal. 46, 23 Am. St. Rep. 447, 26 Pac. 636; Compton v. Benham (Ind. App.), 85 N. E. 365; Randlett v. Rice, 141 Mass. 385, 6 N. E. 238; Norcross v. Norcross, 155 Mass. 425, 29 N. E. 506; Commonwealth v. Stevens, 196 Mass. 280, 82 N. E. 33; State v. Kennedy, 207 Mo. 528, 106 S. W. 57; Goldbeck v. Goldbeck, 18 N. J. Eq. 42; Voorhees v. Voorhees' Exrs., 46 N. J. Eq. 411, 19 Am. St. Rep. 404, 19 Atl. 172; Dunbarton v. Franklin, 19 N. H. 257; Riddle v. Riddle, 26 Utah, 268, 72 Pac. 1081; Holmes v. Holmes, 1 Saw. 99, Fed. Cas. No. 6638.

Cohabitation not Matrimonial in Character.—Cohabitation which will sustain a common-law marriage must be matrimonial in its char-

acter; and a matrimonial cohabitation is the living together of a man and a woman, ostensibly as husband and wife, with or without sexual intercourse between them. Cohabitation consists of a living or dwelling together in the same habitation as husband and wife, and not merely sojourning or visiting or remaining together for a time. Sexual intimacy or illicit living together is not enough: Cox v. State, 117 Ala. 103, 67 Am. St. Rep. 166, 23 South. 806, 41 L. R. A. 760; Letters v. Cady, 10 Cal. 533; Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131; Kilburn v. Kilburn, 89 Cal. 46, 23 Am. St. Rep. 447, 26 Pac. 636; Taylor v. Taylor, 10 Colo. App. 303, 50 Pac. 1049; Cartwright v. McGown, 121 Ill. 388, 2 Am. St. Rep. 105, 12 N. E. 737; McKenna v. McKenna, 73 Ill. App. 64; In re Imboden's Estate, 111 Mo. App. 220, 86 S. W. 263; Voorhees v. Voorhees' Exrs., 46 N. J. Eq. 411, 19 Am. St. Rep. 404, 19 Atl. 172; Haley v. Goodheart, 58 N. J. Eq. 368, 44 Atl. 193; In re Brush, 25 App. Div. 610, 49 N. Y. Supp. 803; Lee v. State, 44 Tex. Cr. 354, 72 S. W. 1005, 61 L. R. A. 904; Eldred v. Eldred, 97 Va. 606, 34 S. E. 477; Spencer v. Pollock, 83 Wis. 215, 53 N. W. 490, 17 L. R. A. 848. The essentials of cohabitation are well stated by the Colorado court in Klipfel v. Klipfel, 41 Colo. 40, 124 Am. St. Rep. 96, 92 Pac. 26.

To quote from In re Wallace, 49 N. J. Eq. 530, 25 Atl. 260: "Where a man and woman constantly live together, ostensibly as man and wife, demeaning themselves toward each other as such, and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. Such cohabitation and repute is said to be matrimonial, in distinction from that occasional, hidden and limited cohabitation and repute which marks the meretricious relation. It is always a question whether the cohabitation proved is of the character which will raise a presumption and make prima facie proof of marriage. At best it can do no more, for the presumption may be rebutted."

Cohabitation Illicit in Its Inception.—A cohabitation between a man and woman, illicit in its inception, and so understood by them, is presumed to continue illicit until some proof is made of its change to a matrimonial cohabitation; therefore no presumption of marriage arises from it: Clark v. Cassidy, 64 Ga. 662; Marks v. Marks, 108 Ill. App. 371; Pike v. Pike, 112 Ill. App. 243; Cartwright v. McGown, 121 Ill. 388, 2 Am. St. Rep. 105, 12 N. E. 737; Cram v. Burnham, 5 Me. 213, 17 Am. Dec. 218; Cargile v. Wood, 63 Mo. 501; Clayton v. Wardell, 4 N. Y. 230; Harbeck v. Harbeck, 102 N. Y. 714, 7 N. E. 408; Ahlberg v. Ahlberg, 24 N. Y. Supp. 919; Bates v. Bates, 7 Misc. Rep. 547, 27 N. Y. Supp. 872; United States Trust Co. v. Maxwell, 26 Misc. Rep. 276, 57 N. Y. Supp. 53; Bell v. Clarke, 45 Misc. Rep. 272, 92 N. Y. Supp. 163; McBean v. McBean, 37 Or. 195, 61 Pac. 418; Appeal of Hunt, 86 Pa. 294; Appeal of Reading Fire etc. Ins. Co., 113 Pa. 204, 57 Am. Rep. 448, 6 Atl. 60; Henry v. Taylor, 16 S. D. 424, 93 N. W. 641; Cuneo v. De Cuneo, 24 Tex. Civ. App. 436, 59 S. W.

284; Town of Northfield v. Town of Plymouth, 20 Vt. 582; Eldred v. Eldred, 97 Va. 606, 34 S. E. 477; Spencer v. Pollock, 83 Wis. 215, 53 N. W. 490, 17 L. R. A. 848; Weidenhoft v. Primm (Wyo.), 94 Pac. 453.

Of course the fact that a cohabitation is meretricious in its inception does not preclude the parties from subsequently entering into a valid marriage contract and effecting a lawful marriage union: Elzas v. Elzas, 171 Ill. 632, 49 N. E. 717; Foss v. Brown, 151 Mich. 119, 114 N. W. 873; Swartz v. State, 7 Ohio Dec. 43, 13 Ohio C. C. 62; Travers v. Reinhardt, 25 App. D. C. 567. That their relations were originally illicit is immaterial so long as their minds subsequently meet in the formation of an actual marriage contract: University of Mich. v. McGockin, 62 Neb. 489, 87 N. W. 180, 57 L. R. A. 917. In other words, the presumption that a cohabitation adulterous in its origin continues to be of that character may be rebutted and proved to have become matrimonial, and a lawful common-law marriage established; this fact, that the evil intent of the parties has changed and become matrimonial, may be established by direct or circumstantial evidence: Drawdy v. Hesters, 130 Ga. 161, 60 S. E. 451, 15 L. R. A., N. S., 190; Potter v. Clapp, 203 Ill. 592, 96 Am. St. Rep. 322, 68 N. E. 81; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677; Roberson v. McCauley, 61 S. C. 411, 39 S. E. 570; Edelstein v. Brown (Tex. Civ. App.), 95 S. W. 1126. And inasmuch as the law itself and all its presumptions deprecate illegal and favor lawful relations, slight circumstances may be sufficient to establish a change from an illicit to a legal relation; and no proof of its time or place is indispensable: Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568. Evidence of marriage is strengthened, however, by the fact that previously the parties had no illicit relations: Heymann v. Heymann, 218 Ill. 636, 75 N. E. 1079.

Said the court in Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263: "The rule that a connection, confessedly illicit in its origin, or shown to have been such, will be presumed to retain that character until some change is established, is both logical and just. The force and effect of such a fact is always very great, and we are not disposed in the least degree to weaken or disregard it: Brinkley v. Brinkley, 50 N. Y. 198, 10 Am. Rep. 460. Very often the changed character of the cohabitation is indicated by facts and circumstances which explain the cause and locate the period of the change, so that in spite of the illicit origin the subsequent intercourse is deemed matrimonial: Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; Rose v. Clark, 8 Paige, 574; Starr v. Peck, 1 Hill, 270; Jackson v. Claw, 18 Johns. 346. But a change may occur, and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained. If the facts show that there was or must have been a change, that the illicit beginning has become transformed into a cohabitation matrimonial in its character, it is not imperative that we should be able to say precisely when or exactly why the change occurred: Caujolle v. Ferrie, 23 N. Y. 90. While we have no hesitation about the rule, and shall be prompt to apply it in a case which demands such appli-

cation, we do not see that the facts before us require it, since they fail to establish an illicit origin of the cohabitation as a separate and independent fact."

And in Darling v. Dent, 82 Ark. 76, 100 S. W. 747, it is said: "While it is true that, if it be shown that the relations between Darling and Mrs. Williams were illicit in the beginning, the burden is upon those asserting a valid marriage agreement to show that such an agreement was afterward entered into, still there is no presumption that the relationship continued to be illicit. It is a matter of proof, and not of presumption, whether the relationship continued to be illicit, or whether it was changed to a legal and moral status. Whatever presumptions are indulged are in favor of the legitimacy of such relationship."

A somewhat stricter rule may be inferred from the following extract: "The general rule upon the question of proof of marriage by proof of cohabitation, conduct and declaration of the parties is stated by a learned judge as follows: The general and ordinary presumption of the law is in favor of innocence, in questions of marriage, and of legitimacy where children are concerned. Cohabitation is presumed to be lawful till the contrary appears. Where, however, the connection between the parties is shown to have had an illicit origin, and to be criminal in its nature, the law raises no presumption of marriage: 2 Kent, 87; Jackson v. Claw, 18 Johns. 346; 2 Greenleaf on Evidence, sec. 464; Physick's Estate, 2 Phila. 278. The presumption against marriage, where the connection between the parties is shown to have been illicit in origin, may, however, be overcome by proofs showing that the original connection has changed in its chaiacter, and a subsequent marriage may be established by circumstances, without actual proof of a marriage in fact. The cases cited by the learned counsel for the respondent in their brief in this case fully establish this point. The following cases also illustrate the same subject: Starr v. Peck, 1 Hill, 270; Clayton v. Wardell, 4 N. Y. 230; Caujolle v. Ferrie, 23 N. Y. 90; O'Gara v. Eisenlohr, 38 N. Y. 296; Foster v. Hawley, 8 Hun, 68. The rule laid down in the last case cited is stated as follows: A cohabitation illicit in its origin is presumed to be of that character, unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of an actual contract of marriage. Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual consent": Williams v. Williams, 46 Wis. 464, 32 Am. Rep. 722, 1 N. W. 98.

**Removal of Impediment to Marriage, Followed by Cohabitation.—** Some authorities take the view that where a man and woman commence cohabitation when there is a known impediment to their legal marriage, such as the existence of a prior undissolved marriage of one of them, that their continued cohabitation after the removal of

the impediment raises no presumption of a subsequent marriage: Edelstein v. Brown, 35 Tex. Civ. App. 625, 80 S. W. 1027. Thus, it has been affirmed that a valid marriage will not be presumed to have taken place between parties who lived together as husband and wife under a ceremony of marriage, when the man intended to deceive the wife by a pretended marriage, and knew that he was not competent to marry, because the decree purporting to divorce him from his wife was a nullity, although the parties to the second marriage continued to live together as husband and wife after the first wife had procured a valid divorce from the husband, and therefore after he had capacity to contract a valid marriage: Collins v. Voorhees, 47 N. J. Eq. 315, 555, 24 Am. St. Rep. 412, 20 Atl. 676, 22 Atl. 1054, 14 L. R. A. 364. The fact that a negro woman continues to cohabit with a white man after her emancipation from slavery, as she had done before, raises no presumption of marriage if they subsequently separate and if their marriage would offend the criminal statutes: Keen v. Keen, 184 Mo. 358, 83 S. W. 526.

Some authorities declare that where an attempted marriage is void by reason of the disability of one of the parties, a subsequent marriage will be presumed after the disability has been removed, where the matrimonial relationship is continued, and the parties hold themselves out, and are regarded and treated by their relatives and friends, as husband and wife: Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Rep. 245; Barker v. Valentine, 125 Mich. 336, 84 Am. St. Rep. 578, 84 N. W. 297, 51 N. W. 787; Bechtel v. Barton, 147 Mich. 318, 110 N. W. 935.

There appears to be no doubt that if parties in good faith marry when in fact a legal impediment exists to their marriage, and they continue to cohabit as man and wife after the removal of the impediment to their lawful union, the law presumes a common-law marriage: Cartwright v. McGown, 121 Ill. 388, 2 Am. St. Rep. 105, 12 N. E. 737; Land v. Land, 206 Ill. 288, 99 Am. St. Rep. 171, 68 N. E. 1109; Teter v. Teter, 88 Ind. 494; Busch v. Supreme Tent of Knights of Maccabees of the World, 81 Mo. App. 562; Bull v. Bull, 29 Tex. Civ. App. 364, 68 S. W. 727; United States v. Hays, 20 Fed. 710. The presumption arises immediately after the obstacle is removed: Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568. And even though the removal is unknown, continued cohabitation thereafter evidences consent to live in wedlock: Eaton v. Eaton, 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605.

In other words, when a man and woman in good faith do what they can to render their union matrimonial, but the marriage is ineffectual because one of them is under a legal disability on account of a prior marriage supposed to be (but not) dissolved; and they live together as husband and wife after the disability is removed, supposing and intending themselves to be such, they are husband and wife from the date of the removal of the disability: Poole v. People, 24 Colo. 510, 65 Am. St. Rep. 245, 52 Pac. 1025; Manning v. Spurck, 199 Ill. 447,

65 N. E. 342; Schuchart v. Schuchart, 61 Kan. 597, 78 Am. St. Rep.
342, 60 Pac. 311, 50 L. R. A. 180; Chamberlain v. Chamberlain, 68 N.
J. Eq. 414, 736, 111 Am. St. Rep. 658, 59 Atl. 813, 62 Atl. 680, 3 L.
R. A., N. S., 244; Taylor v. Taylor, 71 N. Y. Supp. 411, 63 App. Div. 231.

If the woman is in good faith, while the man conceals an impedi-
ment to his marriage, then it would seem that a marriage will be
presumed in her favor from cohabitation after the removal of the
impediment: Robinson v. Ruprecht, 191 Ill. 424, 61 N. E. 631; Flana-
gan v. Flanagan, 122 Mich. 386, 81 N. W. 258; Barker v. Valentine,
125 Mich. 336, 84 Am. St. Rep. 578, 84 N. W. 297, 51 L. R. A. 787.
"There is a well-defined distinction between illicit relations, forbid-
den because of an undisclosed disability on the part of one of the
parties thereto, and such relations as are mutually meretricious, in-
volving on the part of the woman knowledge that its character is
not, and is not intended to be, matrimonial": In re Schmidt, 42
Misc. Rep. 463, 87 N. Y. Supp. 428. "The rule ought to be that
where one person is free to enter into the matrimonial relation and
does so in good faith, but the other party is incapable of entering
into such relation because of a former wife or husband living, or other
impediment, when such impediment is removed, if the parties con-
tinue matrimonial cohabitation, continue to introduce and recognize
each other as husband and wife, and are so recognized by their rela-
tives, friends, and by society, it ought to be held that from such
moment they are actually husband and wife, and that, under such
circumstances, it is of no importance that a formal agreement to live
together as husband and wife was not entered into, or that either
did not know that the impediment to such an agreement had been
removed, when, in fact, it had been so removed, and both parties
were competent to enter into the matrimonial state": In re Wells'
Estate, 108 N. Y. Supp. 164, 123 App. Div. 79.

Manifestly, an express agreement to marry, followed by cohabita-
tion in pursuance thereof, does not constitute a common-law marriage
so long as there exists a prior valid marriage between one of the
parties and a third person: Blanks v. Southern Ry. Co., 82 Miss. 703,
35 South. 570.

**Cohabitation not Exclusive in Its Character.**—Cohabitation, in order
to form the basis of marriage, must be exclusive in its character.
It is one of the essential obligations of a valid marriage contract
that it binds the parties to keep themselves separate and apart from
all others and cleave to each other during their joint lives. Where
the evidence shows that a man cohabited with two women, the pre-
sumed innocence of either cohabitation must fall, for it is impossible
for two marriages to exist together, and neither is by such evidence
established: Klipfel v. Klipfel, 41 Colo. 40, 124 Am. St. Rep. 96, 92
Pac. 26; Riddle v. Riddle, 26 Utah, 268, 72 Pac. 1081.

**Reputation of Marriage as Evidence.**—Where a man and woman
have held themselves out to the world as husband and wife, this is
strong, persuasive evidence that they are married: Drawdy v. Hesters,

130 Ga. 161, 60 S. E. 451, 15 L. R. A., N. S., 190; Alden v. Church, 106 Ill. App. 347; Pegg v. Pegg (Iowa), 115 N. W. 1027; Hoffman v. Simpson, 110 Mich. 133, 67 N. W. 1107; State of Maryland v. Baldwin, 112 U. S. 490, 5 Sup. Ct. 278, 28 L. Ed. 822; Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568. Indeed, the reputation of the parties as married in the community in which they live may be one of the essentials of a common-law marriage, for cohabitation without a contract of marriage or without a general reputation of marriage can hardly amount to a common-law marriage: Sharon v. Sharon, 75 Cal. 1, 16 Pac. 345; Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131; In re Terry's Estate, 58 Minn. 268, 59 N. W. 1013; Hulett v. Carey, 66 Minn. 327, 61 Am. St. Rep. 419, 69 N. W. 31, 34 L. R. A. 384; Heminway v. Miller, 87 Minn. 123, 91 N. W. 428. "Where parties live together ostensibly as man and wife, demeaning themselves toward each other as such, and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. Indeed, the most usual way of proving marriage, except in actions for criminal conversation and in prosecutions for bigamy, is by general reputation, cohabitation and acknowledgment": Travers v. Reinhardt, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.

What Constitutes Reputation.—When a marriage contract is kept secret, this does not invalidate it; there may be an assumption of marital relations without their being made public. But secrecy in an alleged marriage is a circumstance to be considered in determining whether such a marriage in fact exists: Cargile v. Wood, 63 Mo. 501; Rose v. Clark, 8 Paige, 574; Commonwealth v. Stump, 53 Pa. 132, 91 Am. Dec. 198; Stans v. Baitey, 9 Wash. 115, 37 Pac. 316.

"In order to constitute evidence from which a marriage may be inferred, the origin of the cohabitation must have been consistent with a matrimonial intent, and the cohabitation must have been of such a character, and the conduct of the parties such, as to lead to the belief in the community that a marriage existed, and thereby to create the reputation of a marriage": Williams v. Herrick, 21 R. I. 401, 79 Am. St. Rep. 809, 43 Atl. 1036. "A marriage is a civil contract, and may be made per verba de praesenti—that is, by words in the present tense, without attending ceremonies, religious or civil. Such is the law of many states in the absence of statutory regulation. It is the doctrine of the common law. But, where no such ceremonies are required and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them

whilst living together, such as deeds, wills and other formal instruments. From such recognition the reputation of being married will obtain among friends, associates and acquaintances, which is of itself evidence of a persuasive character": Maryland v. Baldwin, 112 U. S. 490, 5 Sup. Ct. 278, 28 L. Ed. 822.

But reputation to prove marriage must be general and uniform in the community where the parties live: it cannot be founded on divided or singular opinion: Powers v. Charbmury's Exrs., 35 La. Ann. 630; Ashford v. Metropolitan Life Ins. Co., 80 Mo. App. 638; In re Yardley's Estate, 75 Pa. 207; Williams v. Herrick, 21 R. I. 401, 79 Am. St. Rep. 809, 43 Atl. 1036; Eldred v. Eldred, 97 Va. 606, 34 S. E. 477. To quote from the supreme court of Wyoming: "The general reputation in the community where the parties reside as to whether or not they are husband and wife is competent evidence as tending to prove marriage. It is in the nature of a verdict of the community upon their relations, arrived at from observing their conduct, their manner of life, their deportment toward each other and the community, and their declarations. It is the general impression or belief created in the minds of the people from these things which constitutes the general reputation, which may be shown in evidence as tending to raise the presumption of marriage or the contrary. To be of any value as evidence such reputation must be general and uniform": Weidenhoft v. Primm (Wyo.), 94 Pac. 453, citing White v. White, 82 Cal. 427, 23 Pac. 276, 7 L. R. A. 799; Jackson v. Jackson, 82 Md. 17, 33 Atl. 317, 34 L. R. A. 773; Arnold v. Chesebrough, 46 Fed. 700.

"Reputation consists of the belief and speech of the people who have an opportunity to know the parties and have heard of and observed their manner of living": Cargyle v. Wood, 63 Mo. 501. "By general reputation and repute is meant the understanding among the neighbors and acquaintances with whom the parties associate in their daily life, that they are living together as husband and wife and not in meretricious intercourse. In its application to the fact of marriage it is more than mere hearsay. It involves and is made up of social conduct and recognition, giving character to an admitted and unconcealed cohabitation": Klipfel v. Klipfel, 41 Colo. 40, 124 Am. St. Rep. 96, 92 Pac. 26; Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263.

Presumption from Cohabitation and Reputation.—Where a man and woman live together as husband and wife, and so acknowledge themselves to, and are so reputed among, relatives and acquaintances, these facts are sufficient prima facie to establish a marriage, although there is an entire failure of evidence of a formal ceremony. In other words, a presumption of marriage arises from cohabitation as husband and wife and reputation of marriage in the community: Bynon v. State, 117 Ala. 80, 67 Am. St. Rep. 163, 23 South. 640; Moore v. Heineke, 119 Ala. 627, 24 South. 374; Tarrt v. Negus, 127 Ala. 301, 28 South. 713; Klipfel v. Klipfel, 41 Colo. 40, 124 Am. St. Rep. 96, 92 Pac. 26; State v. Wilson, 5 Penne. (Del.) 77, 62 Atl. 227; Myatt v. Myatt, 44

Ill. 473; Nossaman v. Nossaman, 4 Ind. 648; Smith v. Fuller (Iowa), 108 N. W. 765; Bartee v. Edmunds, 29 Ky. Law Rep. 872, 96 S. W. 535; Holmes v. Holmes, 6 La. 463, 26 Am. Dec. 482; Jones v. Jones, 45 Md. 144; Inhabitants of Newburyport v. Inhabitants of Boothbay, 9 Mass. 414; Sorensen v. Sorensen, 68 Neb. 483, 94 N. W. 540, 98 N. W. 837, 100 N. W. 930, 103 N. W. 455; Cramsey v. Sterling, 97 N. Y. Supp. 1082, 111 App. Div. 568; Thompson v. Nims, 83 Wis. 2, 53 N. W. 502, 17 L. R. A. 847. And this presumption is one of the strongest known to the law; it can be overcome only by cogent proof: Plattner v. Plattner, 116 Mo. App. 405, 91 S. W. 457; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677; Stevens v. Stevens, 56 N. J. Eq. 488, 38 Atl. 460; note to Pittinger v. Pittinger, 89 Am. St. Rep. 198.

Nevertheless cohabitation and reputation do not constitute marriage, but simply are evidence thereof. The presumption of marriage which arises from them, however strongly favored by the law, is rebuttable: Myatt v. Myatt, 44 Ill. 473; Marks v. Marks, 108 Ill. App. 371; Boone v. Purnell, 28 Md. 607, 92 Am. Dec. 713; Adair v. Mette, 156 Mo. 496, 57 S. W. 551; State v. St. John, 94 Mo. App. 158, 68 S. W. 374; Olsen v. Peterson, 33 Neb. 358, 50 N. W. 155; Peck v. Peck, 12 R. I. 485, 34 Am. Rep. 702; Allen v. Hall, 2 Nott. & McC. 114, 10 Am. Dec. 578; Eldred v. Eldred, 97 Va. 606, 34 S. E. 477.

Separation of Parties.—The presumption of marriage which arises from cohabitation and reputation is rebutted where the parties separate and one of them, while the other is known to be alive, marries or cohabits with a third person: Weatherford v. Weatherford, 20 Ala. 548, 56 Am. Dec. 206; Moore v. Heineke, 119 Ga. 627, 24 South. 374; In re Beverson's Estate, 47 Cal. 621; In re Maher's Estate, 183 Ill. 61, 56 N. E. 124; Jones v. Jones, 45 Md. 144; Jones v. Jones, 48 Md. 391, 30 Am. Rep. 466. But where a common-law marriage is almost conclusively established by the evidence, the fact that subsequently both parties again marry without having obtained a divorce, the marriage of the woman being after the man had been absent and unheard of for over seven years, is not conclusive against the common-law marriage: Smith v. Fuller (Iowa), 108 N. W. 765.

Subsequent Ceremonial Marriage.—A subsequent ceremonial marriage between the parties is not inconsistent with a prior common-law marriage between them, and does not necessarily overcome the presumption thereof from matrimonial cohabitation, repute, and the declarations and acts of the parties: Simmons v. Simmons (Tex. Civ. App.), 39 S. W. 639; Shank v. Wilson, 33 Wash. 612, 74 Pac. 812; Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568. But the fact that a ceremonial marriage is performed, after many years of cohabitation, on the advice of a friend who deems it necessary, is evidence that a general and uniform reputation of marriage is lacking: Williams v. Herrick, 21 R. I. 401, 79 Am. St. Rep. 809, 43 Atl. 1036.

**Statutes Prescribing Formalities of Marriage.**—Statutes prescribing the procurement of a license and other formalities to be observed in the solemnization of marriage do not render invalid a marriage entered into according to the common law, but not in conformity with the statutory formalities, unless the statutes themselves expressly declare such marriages invalid, and this although the statutes prescribe penalties for ignoring their provisions. Such statutes have uniformly been held directory only: See the note to State v. Lowell, 79 Am. St. Rep. 361; Campbell's Admr. v. Gullatt, 43 Ala. 57; Askew v. Dupree, 30 Ga. 173; Renfrow v. Renfrow, 60 Kan. 277, 72 Am. St. Rep. 350, 56 Pac. 534; Dumaresly v. Fishly, 10 Ky. (3 A. K. Marsh.) 368; State v. Bittick, 103 Mo. 183, 23 Am. St. Rep. 869, 15 S. W. 325, 11 L. R. A. 587; Snuffer v. Karr, 197 Mo. 182, 94 S. W. 983; State v. Zichfeld, 23 Nev. 304, 62 Am. St. Rep. 800, 46 Pac. 802, 34 L. R. A. 784; Reaves v. Reaves, 15 Okl. 240, 82 Pac. 490, 2 L. R. A., N. S., 353; Rodebaugh v. Sanks, 2 Watts, 9; Burnett v. Burnett (Tex. Civ. App.), 83 S. W. 238; Burks v. State (Tex. Civ. App.), 94 S. W. 1040; Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826; Mathewson v. Phoenix Iron Foundry, 20 Fed. 281.

In some states, however, the statutes have expressly taken away the right to contract a common-law marriage, and have made a substantial compliance with the statutory formalities essential to a valid marriage: See the authorities cited in the second succeeding paragraph.

**Jurisdictions Where Common-law Marriages Recognized.**—The validity of common-law marriages has been recognized in the jurisdictions indicated by the following citations: Tarrt v. Negus, 127 Ala. 301, 28 South. 713; Darling v. Dent, 82 Ark. 76, 100 S. W. 747; Klipfel v. Klipfel, 41 Colo. 40, 124 Am. St. Rep. 96, 92 Pac. 26; Askew v. Dupree, 30 Ga. 173; Drawdy v. Hesters, 130 Ga. 161, 60 S. E. 451, 15 L. R. A., N. S., 193; Hiler v. People, 156 Ill. 511, 47 Am. St. Rep. 221, 41 N. E. 181; Franklin v. Lee, 30 Ind. App. 31, 62 N. E. 78; Davis v. Pryor, 3 Ind. Ter. 396, 58 S. W. 660; Porter v. United States (Ind. Ter.), 104 S. W. 105; Smith v. Fuller (Iowa), 108 N. W. 765; People v. Mendenhall, 119 Mich. 404, 75 Am. St. Rep. 408, 78 N. W. 325; Supreme Tent etc. v. McAllister, 132 Mich. 69, 102 Am. St. Rep. 382, 92 N. W. 770; Hulett v. Carey, 66 Minn. 327, 61 Am. St. Rep. 419, 69 N. W. 31, 34 L. R. A. 384; Hargroves v. Thompson, 31 Miss. 211; Floyd v. Calvert, 53 Miss. 37; In re Imboden's Estate, 128 Mo. App. 555, 107 S. W. 400; Eaton v. Eaton, 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605; State v. Zichfeld, 23 Nev. 304, 62 Am. St. Rep. 800, 46 Pac. 802, 34 L. R. A. 784; Town of Londonderry v. Town of Chester, 2 N. H. 268, 9 Am. Dec. 61; Voorhees v. Voorhees' Exrs., 46 N. J. Eq. 411, 19 Am. St. Rep. 404, 19 Atl. 172; Clark v. Clark, 52 N. J. Eq. 650, 30 Atl. 81; Mullaney v. Mullaney, 65 N. J. Eq. 384, 54 Atl. 1086; Atlantic City R. R. Co. v. Goodin, 62 N. J. L. 394, 72 Am. St. Rep. 652, 42 Atl. 333, 45 L. R. A. 671; Tummalty v. Tummalty, 3 Bradf. Sur. 369; Hicks v. Cochran, 4 Edw. Ch. 107; Geiger v. Ryan, 108 N. Y. Supp. 13, 123 App. Div. 722; In re Wells' Estate,

108 N. Y. Supp. 164, 123 App. Div. 79; Carmichael v. State, 12 Ohio St. 553; Reaves v. Reaves, 15 Okl. 240, 82 Pac. 490, 2 L. R. A., N. S., 353; Estate of McCausland, 213 Pa. 189, 110 Am. St. Rep. 540, 62 Atl. 780; Williams v. Herrick, 21 R. I. 401, 79 Am. St. Rep. 809, 43 Atl. 1036; Ex parte Romans, 78 S. C. 210, 58 S. E. 614; Jackson v. Banister (Tex. Civ. App.), 105 S. W. 66; Burks v. State (Tex. Civ. App.), 94 S. W. 1040; Riddle v. Riddle, 26 Utah, 268, 72 Pac. 1081; Hilton v. Roylance, 25 Utah, 129, 95 Am. St. Rep. 821, 69 Pac. 660, 58 L. R. A. 723; Travers v. Reinhardt, 25 App. D. C. 567.

Jurisdictions Where not Recognized.—The validity of common-law marriages has been denied in the jurisdictions indicated by the following citations: Norman v. Norman, 121 Cal. 620, 66 Am. St. Rep. 74, 54 Pac. 143, 42 L. R. A. 343; Estill v. Rogers, 64 Ky. (1 Bush) 62; Robinson v. Redd's Admr. (Ky.), 43 S. W. 435; Johnson's Heirs v. Raphael, 117 La. 967, 42 South. 470; Denison v. Denison, 35 Md. 361; Norcross v. Norcross, 155 Mass. 425, 29 N. E. 506; Dunbarton v. Franklin, 19 N. H. 257; Holmes v. Holmes, 1 Saw. 99, Fed. Cas. No. 6638; Smith v. North Memphis Sav. Bank, 115 Tenn. 12, 89 S. W. 392; Offield v. Davis, 100 Va. 250, 40 S. E. 910; Morrill v. Palmer, 68 Vt. 1, 33 Atl. 829, 33 L. R. A. 411; In re McLaughlin's Estate, 4 Wash. 570, 30 Pac. 651, 16 L. R. A. 699; Nelson v. Carlson, 48 Wash. 651, 94 Pac. 477; Beverlin v. Beverlin, 29 W. Va. 732, 3 S. E. 36.